**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America *ex rel*.** | ) | |
| **FEDDELL CAFFEY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09 C 5458** |
| | ) | |
| **MIKE ATCHISON, Warden,** | ) | |
| **Menard Correctional Center,** | ) | |
| | ) | |
| **Respondent.**[1] | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Feddell Caffey was charged in DuPage County with murder and aggravated kidnapping in connection with the deaths of Debra Evans and her children Samantha and Joshua. He was tried and convicted on both counts and was sentenced to death for the murders and thirty years in prison for kidnapping. The Illinois Supreme Court affirmed his conviction and death sentence. *People v. Caffey*, 205 Ill. 2d 52, 792 N.E.2d 1163 (2001).

Caffey then petitioned for post-conviction relief in state court, alleging constitutional deficiencies in his trial. While the post-conviction petition was pending, Illinois Governor George Ryan commuted Caffey's death sentence to a sentence of life without parole.

---

[1] Mike Atchison, the warden of Menard Correctional Center, where Caffey is now incarcerated, is substituted as the respondent in this matter pursuant to Rule 2(b) of the Rules Governing Section 2254 Cases.

The state trial court dismissed Caffey's post-conviction petition in 2005. The Illinois Appellate Court affirmed the dismissal order in April 2008. *People v. Caffey*, No. 2-05-0787, slip op. (Ill. App. Apr. 7, 2008). The Illinois Supreme Court denied Caffey's petition for leave to appeal in September 2008.

Caffey has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that his constitutional rights were violated in several respects in connection with his trial.

### The claims at issue

The state appellate court overruled two of Caffey's claims on procedural grounds rather than on the merits. Both are claims that the prosecution withheld of information that was favorable to Caffey's defense, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In the first of these claims, Caffey alleges that the prosecution did not disclose that a DuPage County prosecutor had interceded to prevent Cook County from prosecuting Patrice Scott, a key witness in the case against Caffey, for her involvement in the crimes. Caffey contends that Scott did not implicate him until after she was threatened with prosecution in Cook County and that this, combined with the intercession by the DuPage County prosecutor, gave her a motive to implicate him in order to deflect suspicion from herself.

The second of Caffey's *Brady* claims that the state appellate court overruled on procedural grounds concerns Vicky Iacullo, whom Caffey wanted to call as a witness at trial to support his defense. Iacullo, who at the time was charged with obstruction of justice, claimed her privilege against self-incrimination, and the prosecution argued that

2

she had a good faith basis to claim the privilege because there was significant evidence supporting her accountability for murder and that as a result it could not give her immunity. As a result, Caffey was unable to call Iacullo to testify. Iacullo was never charged with murder and later pled guilty to obstruction of justice. Caffey alleges, however, that the DuPage County authorities were aware that Iacullo had claimed to have sold narcotics to certain DuPage County prosecutors (including one of the prosecutors at Caffey's trial) and had threatened to reveal this information if she was charged in connection with the murders. Caffey contends that if the prosecution had disclosed this, he could have used it to support a claim that, by charging Iacullo with obstruction and delaying disposition of that charge, the prosecution was interfering with his right to call defense witnesses. This, Caffey says, would have given him a basis to introduce at trial Iacullo's statements to the police, which were consistent with Caffey's defense theory. Caffey also contends that the undisclosed statements, together with the ultimate disposition of Iacullo's case, indicates that the prosecution had an undisclosed deal that if she did not disclose her narcotics dealings with Dupage County prosecutors and would not testify in Caffey's defense, the prosecution would not charge her in connection with the murders.

Caffey has moved for an evidentiary hearing on these two claims (identified as claims V-B and V-C in his petition). For the reason below, the Court grants Caffey's motion. The Court reserves judgment on the remainder of Caffey's petition until after the evidentiary hearing is concluded.

**Facts**

**A.    The trial**

The following is not an exhaustive summary of the facts of this case, but it provides sufficient background for the claims addressed in this decision.

On November 16, 1995, Debra Evans and her ten-year-old daughter Samantha were killed in their Addison, Illinois apartment.  The murders were almost unspeakably brutal.  Evans was nine months pregnant.  The perpetrators cut open her abdomen and removed the child she was carrying.  Samantha's neck was slashed, and she died in the apartment with her mother.  Evans' two-year-old son Jordan was left in the apartment with the bodies of his mother and sister.  Evans' seven-year-old son Joshua was kidnapped at the scene and was found stabbed to death in an alley in Maywood the next day.

In the months before these crimes, Annette Williams had told her family and friends that she was pregnant.  At the time, Williams was dating Feddell Caffey.  She claimed that the baby she was carrying was Caffey's.  Williams, however, was not actually pregnant.

Williams' cousin, Laverne Ward, was a former boyfriend of Debra Evans.  He was the father of Jordan Evans and of the baby Debra Evans was carrying when she was killed.  Evans had previously obtained a restraining order against Ward and had told her friends that Ward was not the father of the child she was carrying.

At the time of the murders, Dwight Pruitt and Patrice Scott lived together in Scott's apartment Villa Park, Illinois.  In the early morning hours of the night Evans was

4

killed, Williams came to Scott's apartment wearing a Grambling Tigers jacket (which had been stolen from the Evans home) and a sweater with blood on it. Joshua was with her. Williams asked Pruitt and Scott if Joshua could spend the night there. Pruitt and Scott agreed. When Joshua woke up the next morning, he told Scott that "burglars" had come into his home and cut his mother and sister, and he proceeded to identify the perpetrators, a conversation that, Pruitt testified, he overheard from the other room.

Pruitt and Scott both testified at Caffey's trial. Both testified that Joshua identified Williams and Ward as two of the burglars. Scott further testified that Joshua had also identified "Feddell" (Caffey's first name). Pruitt testified that though he could not hear perfectly from the other room, he heard Joshua identify a third person named "Adele" or "Vedelle" or "Ladelle." Both Pruitt and Scott testified that Joshua named a fourth person, who Scott said was called "Boo Boo."

Shortly after Joshua made these statements, Williams returned to the apartment. Scott told Williams what Joshua had said, including that he had identified Williams as one of the burglars. Scott testified that Williams then tried to poison Joshua, but he vomited it up. Williams, Joshua, and Scott then left the apartment. Scott further testified that they drove to Williams' apartment, where Scott saw Caffey with an infant. Scott testified that Williams told Caffey and another man that Joshua had identified them, and Williams and Caffey proceeded to choke Joshua. Scott testified that Caffey then went to get a knife and stabbed Joshua to death. Scott further testified that Caffey threatened to hurt Scott and her daughters if she said anything implicating him. Scott testified that she then got in a car with Williams, Caffey, and Joshua, and they drove to

5

Maywood, where Williams and Caffey left Joshua's body in an alley.

Caffey testified in his own defense at trial. He testified that at 2:30 a.m. on the night Debra Evans was killed, Williams and her friend Vicky Iacullo came home to the apartment Caffey shared with Williams. Caffey stated that Williams was holding a baby, and Iacullo told him, "Surprise! Feddell, Junior." He testified that Iacullo told him that Williams had gone into labor at Iacullo's house, and Iacullo had driven Williams to Central DuPage Hospital to have the baby but that Williams had to leave shortly after giving birth because she did not have insurance. Caffey testified that he was initially skeptical of Williams' story but then believed her because she actually had an infant with her. He stated that he then fell asleep next to the baby. The next evening, Caffey testified, he, Williams and the baby went to Iacullo's house, where Iacullo gave him a Grambling Tigers jacket as a "new daddy present."

Iacullo was questioned by the police shortly after the crimes, and she made statements consistent with Caffey's version of events. In these statements, she said that she and Williams surprised Caffey with the infant and that she presented Caffey with the Grambling Tigers jacket as a "new daddy present." At the time of Caffey's trial, however, Iacullo was facing obstruction of justice charges. Caffey wanted to call Iacullo to testify, but she invoked her privilege against self-incrimination. The prosecution supported Iacullo's invocation of her Fifth Amendment rights and said it had a "tremendous amount" of evidence indicating that she was accountable for murder; it refused to grant her immunity (which would have enabled her to testify). Caffey moved to introduce into evidence Iacullo's statements to the police, but the court denied the motion on the ground that the statements were not against Iacullo's penal interest and

6

were not sufficiently reliable to be admitted.

In January 1999, the jury found Caffey guilty of murder and kidnapping and imposed a death sentence. In October 2001, the Illinois Supreme Court upheld the convictions and sentence.

**B.    The post-conviction petition**

**1.    Trial court proceedings**

Caffey filed a *pro se* post-conviction petition in April 2000. The state trial court appointed attorney Richard Kling to represent Caffey. Kling undertook what the record indicates was an extensive investigation.

The record reflects that Kling obtained a tape-recorded statement from a woman named Cara Walker, who knew Iacullo. Walker stated that she had made several statements to the police about things Iacullo had told her. She reported that Iacullo had said she "was involved in something that was someone else's idea," which Walker believed to be the Evans murders. Iacullo had also told Walker that she was not going to go to jail for her involvement because if she did, she would tell everybody that she had been selling drugs to DuPage County prosecutors, including assistant state's attorney Jeffrey Kendall, who ended up being one of the prosecutors in Caffey's case.

Kling also obtained tape-recorded statements from Dwight Pruitt. In one or more of these statements, Pruitt said that he, too, had a relationship with certain DuPage County prosecutors involving narcotics. He said that on one occasion when he was being questioned about the murders, he saw prosecutor Kendall and recognized him as a customer. Pruitt said that when he reported this to trial prosecutor Michael Wolfe,

Wolfe told him to keep quiet about it. Pruitt also told Kling that he had information that another DuPage County prosecutor, Thomas Epach, had kept Patrice Scott from going to jail and had used his influence with Cook County prosecutors to keep her from being prosecuted in Cook County in connection with Joshua Evans' murder.

In January 2004, Caffey filed a motion with the state trial court in which he reported this information and sought a court order permitting him to take the depositions of Pruitt, Iacullo, and Scott so that he could file an amended post-conviction petition. In March 2004, the trial judge authorized Caffey to take Pruitt's deposition but denied his request to take the depositions of Scott and Iacullo. The trial judge later declined Caffey's request to take the depositions of Wolfe, Kendall, and DuPage County State's Attorney Joseph Birkett.

In April 2004, Caffey sought to take the deposition of attorney Terry Ekl. Caffey supported this request with a transcript of an interview with Pruitt, who said that Ekl had arranged to have Cook County drug charges against Pruitt dismissed in return for a video-recorded statement that Pruitt had lied to a television reporter in accusing Kendall of narcotics purchases. Caffey alleged that State's Attorney Birkett appeared to have shared Pruitt's statements to Kling with Ekl, who had been Birkett's campaign manager. The trial judge denied Caffey's request to take Ekl's deposition.

In September 2004, after taking Pruitt's deposition, Caffey filed an amended post-conviction petition. In the petition, Caffey alleged that the prosecution had violated its obligations under *Brady*. First, he alleged that the prosecution had failed to disclose that Pruitt or people working for him had sold narcotics to prosecutor Kendall and that prosecutors had told Pruitt to keep this quiet. Caffey alleged that the non-prosecution

8

of Pruitt was an undisclosed benefit to him and also that Pruitt's drug dealing gave him a motive to curry favor with the prosecution in Caffey's case. Second, Caffey alleged that the prosecution had failed to disclose benefits allegedly given to Pruitt in return for his testimony against Caffey, consisting of favorable treatment at the DuPage County Jail and a decision not to charge Pruitt in connection with his alleged narcotics dealings with Kendall. Third, Caffey alleged that the prosecution had failed to disclose the steps DuPage prosecutors allegedly took, via attorney Ekl, to get Pruitt's narcotics charge in Cook County dismissed. Caffey supported these allegations with Pruitt's deposition, transcripts of six recorded interviews of Pruitt, and documents showing Ekl's request to record an interview with Pruitt at the Cook County Jail, the dismissal of Pruitt's Cook County case, and the filing of an appearance just before the dismissal by the attorney that Pruitt had said Ekl procured to take over representation of Pruitt in that case.

Caffey also alleged in his amended post-conviction petition that Scott received undisclosed benefits from DuPage County prosecutors. In particular, Caffey alleged that assistant state's attorney (ASA) Thomas Epach intervened with Cook County prosecutors, who wanted to charge Scott in Cook County in connection with the murders, and talked them out of it. The undisclosed evidence, Caffey argued, reflected that Scott had not implicated Caffey until she was threatened with prosecution in Cook County. Caffey argued that this gave Scott a motive to implicate him in order to deflect suspicion from herself. To support these allegations, Caffey cited statements by Pruitt and documents reporting an interview of Scott by Epach and a Cook County prosecutor.

Finally, in Caffey's amended post-conviction petition, he alleged that the

9

prosecution had failed to disclose Iacullo's sales of narcotics to DuPage County prosecutors. Caffey alleged that Iacullo was involved in the murders but had been protected from charges due to her knowledge of DuPage County prosecutors' narcotics dealings. He argued, among other things, that knowledge of this would have enabled him to argue successfully that Iacullo's statements to the police should have been admitted at trial when she declined to testify. To support these contentions, Caffey attached transcripts of Kling's interview of Cara Walker.

The prosecution filed a motion to dismiss Caffey's amended petition. It argued that the matters relating to Pruitt were not material within the meaning of *Brady* and that Caffey's other allegations were not properly supported and involved immaterial information in any event. In April 2005, the trial court dismissed all of Caffey's claims except for those relating to Pruitt. The court initially ordered an evidentiary hearing on the Pruitt-related matters but later vacated that order after the prosecution sought reconsideration. In July 2005, the trial court dismissed Caffey's remaining claims.

### 2. Proceedings on appeal

On appeal, the Illinois Appellate Court addressed Caffey's *Brady* claims concerning Pruitt, Scott, and Iacullo.

With regard to Pruitt, the appellate court said that it would consider only his deposition testimony. It declined to consider the recorded interviews of Pruitt on the ground that they were unverified, citing 725 ILCS 5/122-2 and *People v. Niezgoda*, 337 Ill. App. 3d 593, 596-97, 786 N.E.2d 256, 259-60 (2003). *See People v. Caffey*, No. 05-05-787, slip op. at 44 (Resp. Ex. M).

10

The court first addressed the allegations regarding favorable treatment of Pruitt at the DuPage County Jail. It concluded that the alleged benefits at the jail were minor and the evidence did not show that they were given in return for his testimony against Caffey. *Id.* at 45-46. The court determined that any undisclosed benefits were not material under *Brady*, noting that Pruitt's testimony at Caffey's trial was consistent with his testimony at a pretrial hearing that predated his incarceration at the jail; he was not the only witness against Caffey; and the evidence at trial was not close. *Id.* at 46-48.

With regard to the issue of the non-prosecution of Pruitt for involvement in the Kendall drug transactions, the appellate court noted that at his deposition, Pruitt had stated that he had not witnessed any actual handover of drugs to Kendall. The court declined to consider Pruitt's statement in a later interview that he had, in fact, witnessed the narcotics deals, on the ground that this statement was unverified. *Id.* at 49. The court also concluded even if the drug transactions had occurred, their nondisclosure did not violate *Brady*, because the undisclosed evidence was not material: Pruitt stated that the dealings involving Kendall had nothing to do with his testimony at Caffey's trial; his testimony at trial was consistent with his testimony at a pretrial hearing that took place before he learned of Kendall's involvement in the drug deals; and his testimony was corroborated by other evidence. *Id.* at 50. The court also rejected Caffey's contention that the evidence about the drug transaction would have enabled him to impeach Scott, Pruitt's girlfriend.

The appellate court next considered Caffey's claim regarding Patrice Scott, in particular, ASA Epach's alleged intervention with Cook County authorities on her behalf.

11

The court determined that Caffey had failed to support the claim with proper evidence. *Id.* at 53. Specifically, the court stated that the only support for this claim consisted of the statements in Pruitt's recorded interviews. The court determined that under a provision of the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-2, as well as the *Niezgoda* case, the interviews could not be considered because they were not verified or notarized, and the accuracy of the transcripts, prepared by defense counsel's secretary, was likewise not verified. *People v. Caffey*, slip op. at 53.

The court went on to consider Caffey's contention that Pruitt's deposition testimony that his statements at the pertinent interview were truthful constituted sufficient verification of the interview. The court rejected this argument, stating that Pruitt was not given the twenty-two page interview transcript to read at the deposition and that he was not asked to verify the accuracy of the particular statements regarding Scott. *Id.* at 56-57. The court again cited section 122-2 and the *Niezgoda* case as authority for its conclusion. *Id.* at 57.

The court likewise rejected Caffey's argument that his allegations that Epach had assisted Scott were supported by other evidence. Caffey cited evidence of a November 1995 interview of Scott by Epach and a Cook County prosecutor, conducted to determine whether the murder of Joshua should be prosecuted in Cook County. Caffey argued that despite several interviews of Scott by law enforcement before this, it was only during this interview that she said Joshua had identified Caffey as a perpetrator. Caffey also noted that at trial, Scott had testified that at some point the police had told her Williams claimed she (Scott) had helped strangle Joshua. Caffey argued that this indicated that Epach and the Cook County prosecutor had evidence of Scott's

12

culpability at the time of their interview and that this was used to induce her to identify Caffey. *Id.* at 57-58. The appellate court said, however, that this did not lend any support to the contention that Epach had intervened to prevent Cook County from prosecuting Scott. *Id.* at 58-59. The court also affirmed the trial judge's decision not to permit Caffey's counsel to take Scott's deposition during the post-conviction proceedings. *Id.* at 59-60. In this regard, the court noted that Caffey could have asked Pruitt during his deposition about beneficial treatment given to Scott. *Id.* at 60.

Finally, the appellate court considered Caffey's *Brady* claim regarding Iacullo. To recap, Caffey contended that the prosecution had failed to disclose that it had information that Iacullo had sold drugs to Kendall and had threatened to reveal this if she was charged in connection with the murder. Caffey argued (among other things) that this evidence, together with the evidence regarding Iacullo's obstruction of justice charge, would have enabled him to seek admission at trial of Iacullo's favorable statements on the ground that the prosecution was interfering with his right to present defense witnesses. The appellate court concluded that the trial judge had not erred in finding these allegations "unsworn and unsubstantiated," noting that the only evidence Caffey had submitted was a transcript of an interview with Cara Walker that was neither signed by her nor notarized. The court again cited section 122-2 and the *Niezgoda* case. *Id.* at 61-62.

### 3. Caffey's current claims

Caffey reasserts in his petition for habeas corpus (among other claims) the claims that the state appellate court overruled on procedural grounds. He has

requested an evidentiary hearing to allow him to further develop the factual bases for these claims. Because the state court did not decide these claims on the merits, *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), does not prevent the Court from expanding the record or conducting an evidentiary hearing on these claims.

Respondent Mike Atchison, the warden of the prison where Caffey is incarcerated, opposes Caffey's request for an evidentiary hearing. He contends that the claims at issue here cannot properly be considered on their merits because the state court rejected the claims on independent and adequate state-law grounds. In this regard, respondent has consistently contended that the state appellate court did not consider the constitutional merits of these claims but instead decided them on procedural state-law grounds. *See* Resp.'s Answer at 68-69, 72; Resp.'s Surreply at 3. Respondent also argues that Caffey has not met the standards for entitlement to an evidentiary hearing.[2]

## Discussion

### A. Availability of federal habeas corpus review

A federal court may not consider a claim in a habeas corpus petition if the state court declined to address the petitioner's federal issues on their merits and instead decided the case "on a state law ground that is independent of the federal question and

---

[2] Respondent also contends that Caffey forfeited any right to an evidentiary hearing by failing to ask for it in his habeas corpus petition. The Court rejects this argument. Caffey's petition included a request for an evidentiary hearing. *See* Petition at 45.

adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).[3] The state ground can be substantive or procedural. *Lee v. Kemna*, 534 U.S. 362, 376 (2002). It is considered "independent" of the federal question "'only if the state court actually relied on a state rule sufficient to justify its decision.'" *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005) (quoting *Prihoda v. McCaughtry*, 910 F.2d 1379, 1382 (7th Cir. 1990)).

The adequacy of the state law ground is a question of federal law. *Miranda*, 394 F.3d at 992 (citing *Lee*, 534 U.S. at 375). A state ground is considered adequate only if the state courts apply the state rule "'in a consistent and principled way'" as of the time of the alleged default. *Id.* (quoting *Prihoda*, 910 F.2d at 1383); *see also, Promotor v. Pollard*, 628 F.3d 878, 886 (7th Cir. 2010). It must represent a "firmly established and regularly followed" state practice. *Lee*, 534 U.S. at 376 (citing *James v. Kentucky*, 466 U.S. 341, 348 (1984), and *Ford v. Georgia*, 498 U.S. 411, 422-24 (1991)); *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). By contrast, a state rule that "is invoked 'infrequently, unexpectedly, or freakishly'" fails the test of adequacy. *Miranda*, 394 F.3d at 995; *Prihoda*, 910 F.2d at 1383. In addition, the Supreme Court has stated that there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee*,

---

[3] A federal court may consider on the merits a claim that the state court decided on an independent and adequate state law ground if the habeas corpus petitioner shows cause for his failure to comply with the state law rule and prejudice resulting from the default, or if a miscarriage of justice will occur if he is not granted relief. *See, e.g., Harris v. Reed*, 489 U.S. 255, 262 (1989); *Miranda*, 394 F.3d at 992. Caffey does not, however, argue the cause and prejudice or miscarriage of justice exceptions in his petition or his reply brief.

15

534 U.S. at 376 (citing *Davis v. Wechsler*, 263 U.S. 22, 24 (1923)).

That said, the fact that state courts grant exceptions to a rule on fairness or equitable grounds does not mean that the rule is not regularly or consistently applied. *See Promotor*, 628 F.3d at 886. "A regular practice may still, in the interest of justice, allow room for flexibility." *Id. See generally Walker v. Martin*, 131 S. Ct. 1120, 1128 (2011) ("A rule can be firmly established and regularly followed . . ., even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others.") (internal quotation marks and citations omitted).

With these principles in mind, the Court turns to the state appellate court's disposition of the two claims at issue. It is clear, as respondent contends, that the state appellate court relied upon state law grounds in overruling Caffey's claims regarding Scott and Iacullo and did not reach those claims on their merits. *See* Resp.'s Answer at 68-69, 72; Resp.'s Surreply at 3. Specifically, the court cited 725 ILCS 5/122-2 and *People v. Niezgoda* in declining to consider the evidence that Caffey had offered to support those claims. First, the appellate court declined to consider the interviews of Pruitt that Caffey submitted in support of the Scott claim, on the ground that they were unsworn and the transcripts were not notarized or verified. The court also rejected Caffey's argument that Pruitt had sufficiently verified the contents of the interviews while under oath during his deposition. Second, the appellate court declined to consider the interview of Cara Walker that Caffey submitted in support of the Iacullo claim, on the ground that the interview was unsworn and the transcript was not notarized or verified. In support of both of these rulings, the court cited section 122-2 and *Niezgoda*, and only

16

those two authorities.

Section 122-2 of the Illinois Post Conviction Hearing Act provides that a post-conviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2. The purpose of section 122-2 is to show that a defendant's post-conviction allegations "are capable of objective or independent corroboration." *People v. Collins*, 202 Ill. 2d 59, 67, 782 N.E.2d 195, 199 (2002).

In the *Niezgoda* case, the defendant, a Polish immigrant, filed a post-conviction petition in which he stated that before he pled guilty to a narcotics charge, his attorney told him that he would not be deported as a result, but that shortly after he pled guilty, immigration authorities took him into custody. In an amended petition, the defendant added an allegation that he was not told when arrested that he had the right to consult with Polish consular authorities. The defendant supported his claims with his own affidavit and affidavits from three other people, none of which were notarized. The trial court granted a motion to dismiss the petition. *Niezgoda*, 337 Ill. App. 3d at 594, 786 N.E.2d at 258. On appeal, the court ruled that the affidavits were insufficient to be considered because they were not notarized. *Id.* at 596-97, 786 N.E.2d at 259. It ruled that the defendant was "required to support [his] allegations with sworn affidavits" but had not done so, and the affidavits he submitted "had no legal effect." *Id.* at 597, 786 N.E.2d at 260. For this reason, the court ruled, the trial judge properly dismissed the petition without an evidentiary hearing. *Id.*

It is unclear whether the appellate court's citation of section 122-2 and *Niezgoda*

17

in Caffey's case amounts to reliance on "a state rule sufficient to justify its decision" (i.e., an "independent" state law ground). The ruling in *Niezgoda* was that an unnotarized affidavit could not be considered. This holding did not, by itself, control Caffey's case, because he submitted no affidavits of any sort, sworn or unsworn, on the particular claims at issue. Nor did section 122-2 require him to do so; the statute expressly allows a post-conviction petitioner to support his claims with "affidavits, *records, or other evidence.*" 725 ILCS 5/122-2 (emphasis added). Indeed, the statute does not make even this mandatory; it permits a defendant to explain "why the same are not attached" to his petition. *Id.*

The Court need not decide, however, whether the authorities cited by the appellate court amount to "independent" state law grounds as that term is used in the habeas corpus context. The reason is that the Court finds meritorious Caffey's primary argument, which is that the purported state rule or rules on which the appellate court relied are not "adequate" as federal habeas corpus law defines that term.

The appellate court evidently understood section 122-2 and *Niezgoda* to require sworn verification of any evidence submitted to support a post-conviction petition. Thus the question is whether a requirement of sworn verification of evidence was a "firmly established and regularly followed" Illinois procedural rule in this context at the time. *Lee*, 534 U.S. at 376.

Respondent has not persuaded the Court that the purported procedural rule upon which the appellate court relied meets this standard. First, there is a significant question regarding whether section 122-2 even applied at the stage of the post-conviction proceedings that Caffey's case had reached. Petitions for post-conviction

18

relief are subject to a three-stage review process.[4]  *See, e.g., People v. Pendleton*, 223 Ill. 2d 458, 472, 861 N.E.2d 999, 1007 (2006).  At the first stage, the trial court reviews the petition to ascertain whether it sets forth the gist of a meritorious constitutional claim.  At the second stage, the trial court appoints counsel if necessary, the prosecution may file an answer or a motion to dismiss, and the court may consider that motion.  At this stage, all factual allegations by the petitioner that are not positively rebutted by the record are accepted as true.  At the third stage (if the case continues that far), the trial court conducts a hearing at which the defendant may present evidence in support of the petition.  *See id.* at 472-73, 861 N.E.2d 1007-08; *People v. Hall*, 217 Ill. 2d 324, 332-35, 841 N.E.2d 913, 918-20 (2005).  The same appellate court that upheld the dismissal of Caffey's claims based on section 122-2 has since acknowledged – based on an Illinois Supreme Court decision that *preceded* the appellate court's consideration of Caffey's petition – that "the affidavit requirement of section 122-2 does not apply beyond the first stage of the proceedings."  *People v. Clark*, ___ Ill. App. 3d ___, 957 N.E.2d 162, 169 (2011) (citing *People v. Hall*, 217 Ill. 2d 324, 332, 841 N.E.2d 913, 919 (2005)).  Caffey's post-conviction petition had undeniably progressed past the initial, threshold review stage by the time the trial judge dismissed it.  Despite this, the appellate court relied on section 122-2 in upholding what plainly was *not* a first-stage dismissal.  Thus the court's requirement of submission of sworn evidence likely amounted to enforcing a "rule" that did not even apply given the procedural status of Caffey's case.

---

[4] By the time Caffey's post-conviction petition was considered, he was no longer facing a death sentence.

Even assuming section 122-2 applied, however, the appellate court used it in an unpredictable way, inconsistent with the statute's language and prior law, in declining to consider Caffey's *Brady* claims. In numerous cases decided before Caffey's, Illinois courts considered unsworn evidence in post-conviction proceedings, including witness statements. For example, in *People v. Spreitzer*, 143 Ill. 2d 210, 572 N.E.2d 931 (1991), the court considered in connection with a post-conviction petition an unsworn statement by a witness in addressing a claim that trial counsel had failed to investigate certain witnesses (including the witness whose unsworn statement the defendant offered). *See id.* at 217-20, 572 N.E.2d at 934-35. *See also, e.g., People v. Smith*, 352 Ill. App. 3d 1098, 1109, 817 N.E.2d 982, 1108-09 (2004) (considering a court filing by a defendant in a different case); *People v. Ledbetter*, 342 Ill. App. 3d 285, 288, 794 N.E.2d 1067, 1069-70 (2003) (considering a newspaper article, over a section 122-2 objection, and stating that "defendant attached evidence supporting his allegations" in compliance with the statute's requirement of an affidavit, record, or other evidence); *People v. Edsall*, 94 Ill. App. 3d 469, 473, 418 N.E.2d 943, 946 (1981) (considering letters sent to the trial judge as evidence that defendant suffered from a mental disability).

With regard to the appellate court's reliance on *Niezgoda*, that case, strictly speaking, holds only that affidavits must be notarized to be considered. The evidence in question in Caffey's case did not come from affidavits; rather, it was "other evidence" as authorized by section 122-2. The appellate court's reliance on *Niezgoda* to bar non-affidavit evidence because it was unsworn was an unexpected application of that case.

20

It did not constitute application of a established state rule in a consistent and principled way.

The Court acknowledges, as previously discussed, that the fact that state courts grant exceptions to rules or sometimes exercise their discretion not to apply them strictly does not render the application of the rule in another case irregular or inconsistent. *See supra* at 16. Nothing in the Illinois cases the Court discussed above suggests that the courts in those cases were exercising discretionary authority to excuse application of section 122-2. Rather, they were applying the plain language of a statutory provision that *on its face* does not require all evidence to be sworn. By contrast, in Caffey's case this rule was applied in a rigid and hypertechnical way – indeed, contrary to its express language – to preclude consideration of Caffey's federal constitutional claims on their merits.

To put it another way, the appellate court's decision in Caffey's case does not reflect that it was applying section 122-2 by its terms or, conversely, that it was merely declining to exercise the discretion built into the rule. Rather, the court appears to have been applying a requirement that it viewed as mandatory, even though that is not what section 122-2 says. This is the essence of the sort of "unexpected" or irregular application of a state procedural rule that renders it inadequate to preclude merits review in federal court of a habeas corpus petitioner's federal claim.

This is illustrated by the court's treatment of Pruitt's interview statements. The appellate court upheld the exclusion of these statements on the ground that they were unsworn. As this Court has noted, neither section 122-2 nor *Niezgoda*, the only two authorities on which the appellate court relied, stands for the proposition that an

unsworn statement is inadmissible in a post-conviction proceeding. But that aside, the statements by Pruitt that Caffey submitted in support of his *Brady* claim concerning Scott can hardly be called unsworn. Even though Pruitt did not make the particular statements under oath in the first instance, he verified under oath in his subsequent deposition that what he had said in the earlier interview was accurate. Though it is true, as the appellate court noted, that Pruitt's attention was not called to the specific portion of the interview, he clearly stated that he had spoken the truth in the interview. This certainly could provide a basis for discounting the weight to be given to what Pruitt had said, but excluding it altogether under section 122-2 and *Niezgoda* extended those authorities far beyond their bounds, in an unpredictable way. *Niezgoda* did not even apply, given its narrow focus on whether affidavits must be notarized; and section 122-2 requires only an "explanation," which Caffey gave. Nothing in any previous Illinois case would have told Caffey or his post-conviction attorney that a witness's sworn testimony in a deposition that he had spoken the truth in an earlier statement could not be used to support a post-conviction petition. In sum, it is fair to conclude, as Caffey contends, that the appellate court "engaged in a hypertechnical reading of the deposition transcript and in doing so resorted to an 'exorbitant application' of section 122-2 to defeat" the claim. Pet.'s Reply at 62 (quoting *Lee*, 534 U.S. at 376).

Caffey's claim regarding Iacullo might be thought to present a closer call, because Caffey did not obtain later verification of the statements about Iacullo in the Walker interview. But this was not for lack of trying. Caffey sought to take the deposition of Iacullo (as he had sought to take the deposition of Scott), but the prosecution successfully persuaded the trial court to refuse this. Caffey's counsel also

22

explained that he had been unable to locate Iacullo despite diligent efforts. A straightforward application of section 122-2 would have led to consideration of the claim on its merits. *See People v. Smith*, 352 Ill. App. 3d 1095, 1107, 817 N.E.2d 982, 994 (2004) (finding section 122-2's "explanation why the same [were] not attached" language satisfied when trial record demonstrated that state had opposed petitioner's attempt to take a deposition from a key party.). Yet the state appellate court, as it had done on the claim regarding Scott, applied section 122-2 and *Niezgoda* in an unpredictable way to preclude consideration of the merits of Caffey's claim.

Given these circumstances, the Court concludes that the state appellate court did not apply a firmly established and regularly followed rule in refusing to consider Caffey's evidence supporting the Pruitt and Iacullo-related claims on the ground that the evidence was unsworn.

Respondent argues that federal courts have repeatedly held that an Illinois court's dismissal of a post-conviction petition based on noncompliance with section 122-2 constitutes an independent and adequate state ground and therefore procedurally defaults a federal habeas claim. Resp.'s Surreply at 4. This argument misses the point. Caffey does not argue, and the Court does not hold, that failure to comply with section 122-2 can never constitute an independent and adequate state law ground barring federal review of a habeas corpus petitioner's constitutional claim. Rather, Caffey contends that the appellate court used that rule in an irregular and unexpected way *in his case*, such that it is inadequate to bar federal review of his federal constitutional claims. Nothing in the cases respondent cites indicates that a state court's mere invocation of section 122-2 prevents a federal court from

23

considering, as this Court has, whether the state courts actually applied that rule and did so "in a consistent and principled way." *Miranda*, 394 F.3d at 992. And none of them involved application of section 122-2 to bar consideration of evidence of the sort that Caffey submitted. *See, e.g., United States ex rel. White v. Chandler*, No. 05 C 2445, 2008 WL 4390058, at *14 (N.D. Ill. Sept. 24, 2008) (petitioner had not supported his post-conviction petition with "*any* affidavits, attachments, or any other type of documents"); *United States ex rel. Burress v. Weger*, No. 06 C 423, 2006 WL 2861104, at *4 (N.D. Ill. Sept. 27, 2006) (state appellate court relied on petitioner's failure to attach *anything* to petition supporting a particular claim); *United States ex rel. Wright v. Jones*, No. 06 C 1541, 2006 WL 2631962, at *5 (N.D. Ill. Sept. 1, 2006) (state appellate court concluded that petitioner had failed to provide "affidavits, records, *or other evidence*" supporting his allegations or to explain why he did not submit such materials); *United States ex rel. Edwards v. Sternes*, No. 04 C 1610, 2005 WL 3447773, at *3 (N.D. Ill. Dec. 13, 2005) ("failure to attach sufficient documentation" is a sufficient basis to apply section 122-2; no discussion of any requirement of *sworn* evidence); *United States ex rel. Carini v. Mote*, No. 03 C 9416, 2004 WL 442671, at *6 & n.3 (N.D. Ill. Mar. 3, 2005) ("Carini's appeal was insufficient because he failed to attach affidavits *and other evidence* substantiating his attack on Schultz's testimony."). (The only Seventh Circuit case respondent cites, *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 242 (7th Cir. 2003), states that a claim that counsel failed to investigate and call a particular witness must be supported by an affidavit from the witness, which was not the issue or the claim in Caffey's case.) None of these cases

24

involved use of section 122-2 to impose a requirement that all evidence must be sworn to be considered at this stage of a post-conviction proceeding.

For these reasons, the Court concludes that Caffey's claims involving Scott and Iacullo are not procedurally defaulted and may be considered on their merits in the present case.

## B.    Availability of an evidentiary hearing

Having concluded that federal review of the claims regarding Scott and Iacullo is not precluded, the Court considers whether Caffey is entitled to an evidentiary hearing on these claims.

Section 2254(e)(2) precludes an evidentiary hearing or expansion of the evidentiary record in support of a habeas corpus petition if the petitioner failed to develop the factual basis for his claim in state court.  28 U.S.C. § 2254(e)(2).  A petitioner's failure to develop the factual basis of his habeas claim in state court bars a hearing or expansion of the record, however, only if this failure was due to "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000); *see also, e.g., Ward v. Jenkins*, 613 F.3d 692, 699 (7th Cir. 2010) ("§ 2254(e)(2)'s bar applies only when the failure to develop the factual basis for a claim is attributable to the petitioner.").

In determining whether the petitioner's failure was due to lack of diligence, "[t]he question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. . . .  Diligence for purposes of the opening clause [of § 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it

25

does not depend . . . upon whether those efforts could have been successful."
*Williams*, 529 U.S. at 435. When evaluating a petitioner's alleged failure to fully
develop the factual basis for a claim in state court, "[d]iligence will require in the usual
case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the
manner prescribed by state law." *Id.* at 437.

With regard to his claim concerning Scott, Caffey presented a statement from
Pruitt indicating that Scott had an arrangement with ASA Epach. He attempted to talk
to Scott, but he was unable to locate her. He requested the opportunity to depose
Scott, but the state court denied the request. Caffey moved for an evidentiary hearing,
a request the state court also denied. Respondent argues that Caffey's attorney failed
to exercise the necessary diligence when he did not ask Pruitt during his deposition
specific questions about ASA Epach's alleged agreement with Scott. But as discussed
above, Caffey's attorney had obtained a statement from Pruitt, who affirmed under oath
that the statement was true. This constituted, under the circumstances, reasonable
diligence in seeking to obtain evidence to support Caffey's claim, particularly in light of
the state court's refusal to permit a deposition of Scott or a hearing on the claim.

Caffey also requested an evidentiary hearing on his *Brady* claim regarding
Iacullo, and he requested permission to take Iacullo's deposition. The state court
denied both requests. Caffey's counsel advised the court that he was unable to locate
Iacullo to talk to her on his own, a statement the prosecution did not dispute.

Based on these facts, the Court concludes that Caffey was sufficiently diligent in
his efforts to develop the factual basis of this claim in state court. The Court therefore
concludes that section 2254(e)(2) does not bar an evidentiary hearing on the two claims

26

on which Caffey has sought a hearing.

## C. Need for an evidentiary hearing

If section 2254(e)(2) does not bar a federal court from conducting an evidentiary hearing, then a court must evaluate the request for an evidentiary hearing under pre-section 2254(e)(2) standards.  *Davis v. Lambert*, 388 F.3d 1052, 1061 (7th Cir. 2004).  A habeas corpus petitioner is entitled to an evidentiary hearing if he has alleged facts that would entitle him to relief and the state courts, for reasons not attributable to him, denied him a full and fair hearing to explore those facts.  *See id*. (citing *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963)); *see also, Kerr v. Thurmer*, 639 F.3d 315, 331 (7th Cir. 2010).  A full and fair hearing is one that afforded the petitioner a complete opportunity to present the facts relevant to his constitutional claim.  *See, e.g., Hampton v. Leibach*, 347 F.3d 219, 235 (7th Cir. 2003).

Caffey has met this standard.  If DuPage County authorities agreed not to prosecute Scott in return for or in connection with her statements implicating Caffey, that would have provided a basis for Caffey's counsel to impeach Scott at trial, and failure to disclose this could be a *Brady* violation.  *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985).  The record at this point is inadequate to evaluate this *Brady* claim properly, because the state court denied Caffey's requests to depose Scott and hold an evidentiary hearing.  *See Davis*, 388 F.3d at 1066 (no full and fair hearing where state court denied an evidentiary hearing).

With regard to Iacullo, Caffey claims, among other things, that her invocation of

27

her privilege against self-incrimination was the result of an express or tacit agreement not to prosecute her for murder.  Caffey also contends that the evidence regarding her threat to reveal a prosecutor's involvement in narcotics transactions would have given him a basis to admit into evidence at trial Iacullo's earlier statements to the police regarding the events surrounding the murders, which were consistent with Caffey's defense theory.  The evidence regarding Iacullo thus could have assisted Caffey in establishing a *Brady* violation as well as a due process claim of interference with defense access to a witness.  *See Newell v. Hanks*, 283 F.3d 827, 837 (7th Cir. 2002).  The record before the Court is similarly inadequate to evaluate these claims given the state court's denial of Caffey's request for depositions and an evidentiary hearing.  Iacullo, Walker, and the prosecutors have never testified or been questioned regarding Caffey's contentions.

For these reasons, the Court grants Caffey's request for an evidentiary hearing on his federal constitutional claims regarding Scott and Iacullo.

**Conclusion**

For the reasons stated above, the Court concludes that federal review of the two *Brady* claims discussed in this decision is not barred and that the Court may conduct an evidentiary hearing on those claims.  The Court therefore grants petitioner's request for an hearing on the claims identified in his petition as claim V-B and V-C.  The Court reserves consideration of the remainder of Caffey's petition until after the conclusion of the evidentiary hearing.  The case is set for a status hearing on February 9, 2012 at 9:30 a.m. for the purpose of setting a date for the evidentiary hearing and a schedule

28

for any matters preliminary to that hearing.


                                        s/ Matthew F. Kennelly
                                 _____
                                        MATTHEW F. KENNELLY
                                     United States District Judge

Date:  February 3, 2012