**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **United States of America ex rel.** ) | |
| **FEDELL CAFFEY,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **No. 09 C 5458** |
| ) | |
| **RICK HARRINGTON, Warden,** ) | |
| **Menard Correctional Center,**[1] ) | |
| ) | |
| **Respondent.** ) | |

**CORRECTED
MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In January 1995, Fedell Caffey was charged in DuPage County with murder and aggravated kidnapping in connection with the deaths of Debra Evans and her children Samantha and Joshua. A jury convicted Caffey on all charges, and he was sentenced to death for the murders and thirty years in prison for kidnapping. The Illinois Supreme Court affirmed his conviction and death sentence. *People v. Caffey*, 205 Ill. 2d 52, 792 N.E.2d 1163 (2001) ("*Caffey I*"). On January 13, 2003, during the pendency of Caffey's post-conviction petition, Governor George Ryan commuted Caffey's death sentence to a sentence of life without parole. The Illinois Appellate Court affirmed the state trial court's denial of Caffey's post-conviction petition in April 2008. *People v. Caffey*, No. 2-05-0787, slip op. (Ill. App. Apr. 7, 2008) ("*Caffey II*"). The Illinois Supreme Court denied Caffey's petition for leave to appeal in September 2008.

---

[1] Rick Harrington is substituted as respondent in this case pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases.

Caffey has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that his constitutional rights were violated in several respects, including violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). After respondent answered Caffey's petition, this Court ruled that Caffey was entitled to expansion of the record and an evidentiary hearing on two of his three *Brady* claims that the Illinois Appellate Court had rejected on procedural grounds. *Caffey v. Atchison*, No. 09 C 5458, 2012 WL 5230298 (N.D. Ill. Feb. 3, 2012) ("*Caffey III*"). The Court assumes familiarity with that decision.

For the following reasons, the Court denies Caffey's petition.

## Background

### A.    Trial court proceedings[2]

On November 16, 1995, Debra Evans was fatally shot and stabbed in the Addison apartment where she lived with James Edwards and her children, Samantha, Joshua, and Jordan. Evans was nine months pregnant, and the baby she was carrying was cut from her uterus. Samantha's neck was slashed, and she died in the apartment with her mother. Evans's two-year-old son, Jordan, was left in the apartment with the bodies of his mother and sister. Evans's seven-year-old son, Joshua, was taken from the scene and was found stabbed to death in an alley in Maywood the next day.

Police arrested Caffey the next night. A DuPage County grand jury subsequently indicted Caffey, his girlfriend Jacqueline Williams, and Williams's cousin Laverne Ward

---

[2] Caffey's petition alleges, without explanation, that the state court's decision on each claim in his habeas petition was based on an "unreasonable determination of facts in light of the evidence presented in [s]tate court proceedings." *See* Pet'r Br. at 22, 24-25, 27, 32, 37, 43. Because Caffey has not provided clear and convincing evidence that the state court's factual determinations are unreasonable, his argument lacks merit. *See Mahaffey v. Schomig*, 294 F.3d 907, 915 (7th Cir. 2005); 28 U.S.C. § 2254(e)(1).

on multiple counts of first-degree murder and aggravated kidnapping. Each defendant had a separate trial.

At Caffey's trial, James Edwards testified that he left the apartment for work at approximately 5:30 p.m. on November 16. He returned home at 2:30 a.m. the next day and found the apartment's back door unlocked. Jordan greeted him at the door. When Edwards went into the living room, he found Evans lying on the floor, covered with a blanket. Edwards tried to talk to Evans, but she was unresponsive. He lifted the blanket from Evans and saw a large wound on her abdomen. Edwards then ran to the children's bedroom and found Samantha on the floor, covered in a blanket, with her neck slashed. Joshua was missing. Edwards went to the neighbors and immediately called 911. When the police arrived, Edwards reported that several items were missing from the apartment, including his Grambling State University Tigers Starter jacket and a pair of poultry shears.

Patrice Scott testified that shortly after midnight on November 17, 1995, Annette Williams, her best friend, came to the Villa Park apartment that Scott shared with Dwight Pruitt and Scott's three daughters. At the time, Scott's youngest daughter, Alexis, was only one and one-half months old. Pruitt testified that while watching television in bed, he heard a knock at the door, went to see who it was, and saw Williams there with a little boy. Pruitt went back to the bedroom and told Scott that Williams was at the door. Scott went to the door, saw Williams and the little boy, and noticed a gray car outside. Both Pruitt and Scott testified that Williams was wearing a Starter jacket and a sweater that had blood on it. They also testified that the little boy was wearing a coat and boots but no socks or pants.

3

Scott testified that Williams asked if the boy could spend the night at Scott's apartment because his mother had been shot, and Williams was going to visit her in the hospital. Scott agreed. Williams told Scott that she had given birth and that she would bring her new baby when she came back in the morning to pick up the boy. Scott stated that approximately one month before this, Williams had told Scott she was pregnant and that she was due in November.

After Williams left, Scott asked the boy his name. He told her his name was Joshua. Scott later put him to bed on her living room couch. She heard Joshua whimpering and crying in the middle of the night. Scott testified that when she woke up to feed her daughter Alexis, Joshua was still crying, so she went into the living room to check on him. Joshua appeared "upset" and "unsettled," and he told Scott that he had to return to his home because Jordan was there alone and Edwards would not know where he was. Resp't Ex. R at C-9558. Joshua told Scott that four burglars had entered his home and cut his mother and sister. When asked how he ended up with Williams, Joshua told Scott that he had been hiding, and that as the burglars were leaving, he ran out after Williams and bumped into her. Scott testified that when she asked Joshua who the four burglars were, Joshua answered, "Annette, Levern and Fedell," and someone named "Boo Boo." Id. at C-9559. Scott testified that Joshua gave her the same account more than three times.

Pruitt testified that he overheard Joshua telling Scott the names of the four burglars because he was sitting in bed watching television with the volume lowered. He also heard Joshua name the four burglars as "Annette"; "Vern"; a name that sounded like "Vadelle," "Adelle," or "Ladelle"; and a fourth name he could not understand. Id. at

C-9131.  After hearing this story, Pruitt got up to get a drink, Scott introduced Pruitt to

Joshua, and Pruitt returned to his bedroom.

Pruitt testified that Joshua continued crying after telling Scott what had happened

to his family.  To calm Joshua down, one of Scott's daughters read him a book, and he

eventually stopped crying.  After Scott's daughters left for school, however, Joshua

asked Scott to lock the doors because he was scared the burglars would return.

Scott testified that at approximately 9 a.m., Williams returned to Scott's

apartment.  Scott told Williams what Joshua had said about the burglary.  She stated

that Williams became very upset, cursed at Joshua, and accused him of lying.  In

response, Joshua asserted repeatedly that he was telling the truth and that "it had

happened."  *Id.* at C-9564.  According to both Scott and Pruitt, Williams then told

Joshua that he had to take some medicine that his mother had left for him.  Joshua

replied that he did not take any medicine.  Williams asked Scott for a glass of water,

which she retrieved from the kitchen.  Williams and Joshua followed Scott to the

kitchen.  Scott then went to the living room, leaving Williams and Joshua in the kitchen.

Joshua came out of the kitchen gagging and saying he needed to throw up.  He went

into the bathroom, passing Pruitt in the bedroom, and vomited.

Scott stated that when Joshua came out of the bathroom, he sat down on the

living room couch.  She again asked Williams about what Joshua had told her that

morning.  Williams continued to deny Joshua's allegations and "told Joshua to face the

other way."  *Id.* at C-9565.  Scott further testified that she agreed to go to Williams's

house so that Williams could check on her baby and retrieve some gifts for Alexis.

Scott brought Alexis along with her.  Williams drove Scott, Alexis, and Joshua in the

same gray car Scott had seen the previous night. After stopping at a convenience store, Williams drove to her house in Schaumburg.

At the house, Williams took Scott into the living room and then went upstairs. Scott told Joshua to sit on the couch and watch Alexis while she looked for a can opener for Alexis's formula. Joshua started playing with video game cartridges. Upon being called by Williams, Scott went upstairs and into a bedroom. Caffey and a "really pale" baby boy with blond hair and tape across his navel were on the bed. *Id.* at C-9571.

Scott testified that she eventually went back downstairs and gave Alexis a bottle of milk. Shortly afterward, Williams called out, asking Scott to bring Joshua downstairs to the laundry room. Scott stated that when she and Joshua went downstairs, Caffey, Williams, and another man were already in the laundry room. One of them told Joshua to sit on the daybed. Scott denied that the other man was Bo Wilson. According to Scott, after the unidentified man left, Caffey asked Williams why she had brought Scott to their home and why Williams had not taken Joshua "to the projects like he told her to." *Id.* at C-9575. Williams responded that Joshua "talked too much" and that he knew their names. *Id.* at C-9575.

Scott testified that Williams then picked up a white rope and told Joshua to lean forward. Caffey and Williams tried to strangle Joshua with the rope. Joshua and Scott screamed, Scott pushed Williams, and Williams let go of the rope. Williams then left the laundry room but returned holding a brown knife, which she put on top of the daybed. Scott screamed and asked Williams to take her home and take Joshua to the police

station.  Scott went upstairs to get Alexis, bringing Joshua with her.  She tried to leave through the front door, but it was locked.

Scott then returned downstairs with Joshua and Alexis.  Scott testified that Caffey threatened her, saying that she "better not say anything" because otherwise, Caffey would "get me and my daughters."  *Id*. at C-9578.  Caffey told Williams to take Scott home, and Caffey, Williams, Scott, Alexis, and Joshua all got into the gray car.  Scott sat in the front passenger seat with Alexis, Joshua sat directly behind her in the back seat, and Caffey sat with Joshua in the back.  Williams was standing outside the car on the side next to where Joshua was seated.  Scott then saw Caffey stab Joshua in the back seat while Williams held him down.  As Joshua was being stabbed, Scott felt him kick the back seat and heard him gasping.

Scott testified that Williams got into the driver's seat of the car and Caffey told her that "she knew where to go."  *Id*. at C-9581.  They drove to Maywood, where Caffey and Williams took Joshua out of the car and helped him walk to the back of a building.  Caffey and Williams returned to the car alone.  Williams got back in the driver's seat and drove Caffey to "where he wanted to go."  *Id*. at C-9582.  After dropping Caffey off, Williams drove Scott back to her apartment.  When they arrived, Williams asked Scott for cleaning supplies.  Scott gave them to her and went back inside her apartment.

Pruitt's testimony about the events in his apartment largely mirrored that of Scott.  He added that once Scott, Alexis, and Joshua left with Williams, he continued to watch television in his bedroom.  While watching the midday news around 11:30 a.m., he saw a story about the murders in Addison.  The story included a family portrait of Evans and her children, and Pruitt recognized Joshua in the photograph.  He got dressed, left the

house, and went to a police trailer to report what he had seen. No one was there. Pruitt

then went to a local store and asked a store clerk if he could use the phone. The clerk

said no but suggested that Pruitt use the payphone in the parking lot. The payphone

was out of order. Pruitt went home.

Pruitt testified that shortly after arriving home, around 12:15 p.m., Williams and

Scott returned. He told Scott what he had seen on the news. According to Pruitt,

Williams came to the door and Scott gave her a scrub brush and some Ajax, but Pruitt

observed that Scott was "trying to get rid of [Williams]." *Id.* at C-9141. Pruitt again left

the apartment to call the police. As he was leaving, he saw Williams cleaning her car.

Pruitt stated that he called the police from a nearby hair salon. A police car

picked him up and took him back to his apartment. Pruitt and Scott accompanied the

police to Maywood, and Scott showed the police where Caffey and Williams had taken

Joshua. The police found Joshua dead.

At trial, Pruitt admitted that he was serving a prison sentence for a weapons

charge. He testified that he was a gang member and had previous convictions for

armed robbery and unlawful possession of a controlled substance. On cross-

examination, Pruitt stated that at the time of the murders, he was not using drugs, was

on parole, and was aware that if he violated his parole, a court would likely send him

back to jail. Pruitt acknowledged that he did not call the police after Joshua named the

alleged burglars, nor did he call the police after witnessing Joshua vomit, although he

thought the incident was odd. Pruitt further stated that although he and Scott did not

have a telephone in their apartment, there were a number of nearby locations –

including stores, gas stations, a mall, and neighbors – with working telephones.

Regarding the 911 call he made from the hair salon, Pruitt admitted that he did not at that time tell the police about the names Joshua had mentioned.  He also admitted that he did not tell the police what Joshua had said after they picked him up from the salon, while he was in the police car with Scott on the way to Maywood, or later that evening when he and Scott were at the police station.  Pruitt explained, however, that he was not formally interviewed in any of those situations.  On redirect, Pruitt stated that on November 18, when he had a sit-down interview with the police, he told them the four names that Joshua had mentioned.

Scott similarly admitted on cross-examination that despite finding several of Williams's behaviors "very bizarre and odd," she did not contact the police.  *Id.* at C-9621, 9623.  Specifically, Scott failed to call 911 after hearing Joshua name the four burglars, after seeing Williams yell at Joshua in response to his identifications, or after seeing Joshua vomit in response to the "medication" that Williams gave him (medication that Williams would not give Joshua in Scott's presence).  Scott said that she did not recall telling officers on November 17 that Joshua had named Caffey as one of the burglars.  On redirect, Scott testified that she did not initially tell the police that Joshua had named Caffey because Caffey had threatened her and her children, and she feared for the safety of her family.

The defense also offered testimony intended to impeach Scott and Pruitt's testimony.  One police officer testified that she showed Scott a photo array on January 19, 1996.  Scott selected a photo of Bo Wilson from this array and, contrary to her trial testimony, stated that Wilson was "definitely" the other man she had seen in the Schaumburg house.  *Id.* at C-10718.  Another police officer testified that when he spoke

with Scott on November 17, she never mentioned that Joshua named the murderers of his mother and sister.  On cross-examination, however, the officer added that the interview was not thorough because other detectives were due to arrive shortly. Furthermore, another police officer testified that on November 18, Scott told him that Joshua "indirectly" named Caffey; on November 22, she did not say that Joshua named Caffey at all.  The same police officer who interviewed Scott on November 18 testified that Pruitt had said that he first heard of the murder on the 10 a.m. news, and that Scott had returned to the apartment at 11 a.m.  This was inconsistent with Scott's earlier testimony on these points.

At trial, officers from several different police departments testified about the circumstances of Caffey's arrest.  After finding Joshua's body in an alley in Maywood, police went to Caffey and Williams's home at 10:45 p.m. on November 18.  Williams and Caffey were not there, but Williams's children and their friends were home.  At 11:45 p.m., Caffey and Williams returned home in the gray car, and the police immediately arrested them.  Williams was carrying Elijah, who had a bloody piece of gauze taped over his navel.  Caffey was wearing the Grambling Starter jacket taken from Evans's apartment, the right cuff of which was stained with blood.  Detective Bill Morris testified that at the time of arrest, Caffey's hair was braided, and he had a mustache and goatee. Detective Mark Van Stedum testified that he saw a large amount of blood on the floor in the rear side of the gray car, although on cross-examination he admitted that he had not included this in his police report when documenting the arrest.

Various investigators, police officers, and evidence technicians testified about evidence collected from Scott and Pruitt's apartment and from the scene of the murders

of Debra Evans and Samantha. Investigators testified that at Scott's Villa Park apartment, they found an empty iodine bottle in the kitchen trash can. On the sidewalk in front of Evans's apartment building, police found the poultry shears that Edwards had reported were missing from the apartment. There was blood on the shears, and one of the handles was broken. DNA tests revealed that the blood belonged to Samantha. There was also blood on the bathroom vanity, which was determined to be Elijah's. Police found a vehicle emissions notice with a bloody fingerprint on it that matched Williams's. Investigators did not find any fingerprints or DNA belonging to Caffey in Evans's apartment.

Police and investigators also testified concerning evidence that they recovered from Caffey and Williams's house. Detective Paul Hardt testified that on November 18, he found a "rusty wooden handled butcher knife" in the dishwasher, which Scott identified as the knife that Caffey used to stab Joshua. *Id.* at C-9736. Detective Hardt also stated that he found a white cable with blood on it in a garbage bag in Caffey and Williams's garage. DNA tests revealed that the blood on the cable belonged to Joshua, and Scott identified the cable as the one Caffey and Williams used to strangle Joshua.

Detective Hardt also testified that he found video game cartridges in the living room, a yellow and pink Baby Magic lotion bottle with a blood stain, and two counterfeit birth certificates on the kitchen counter. DNA tests revealed that the blood on the lotion bottle was a mixture of fluids from both Joshua and Elijah. The birth certificates, which indicated that Williams had given birth on November 16, 1995, had been typed on a typewriter belonging to a woman named Vikki Iacullo.[3]

---

[3] Iacullo's first name is spelled "Vicky" at various spots in the record. The Court is using the spelling that Iacullo herself gave when she testified at the evidentiary hearing before the Court.

11

Police also found blood on the back seat carpet in Caffey and Williams's car. An evidence technician confirmed that the blood had been treated with cleaner and that subsequent DNA tests revealed that the blood belonged to Joshua. Maywood police officer Harold Jenkins testified to finding a bed sheet stained with Joshua's blood seven blocks from where Joshua was found. Officer Valerie Thomas testified that she found a matching sheet and pillowcase in a closet at Caffey and Williams's home.

Finally, police testified that on December 1, 1995, Vikki Iacullo and Dorothy Hale directed them to Herrick Lake in Wheaton, where the gun used to shoot Evans was found. Police confirmed that the gun had fired the bullet that was recovered from Evans's head. Iacullo invoked her Fifth Amendment privilege and declined to testify.

A number of doctors also testified about the forensic evidence in Caffey's case. Dr. Shaku Teas testified concerning the autopsies she performed on Debra Evans and Samantha. With respect to Evans's autopsy, Dr. Teas testified that a bullet had entered the back of Evans's head and traveled through the right side of her brain to the area behind her forehead. In addition, Evans had four incised wounds to her neck. There was a jagged thirteen-inch horizontal wound from one side of Evans's abdomen to the other. Her uterus had been sliced open, and her umbilical cord was hanging out. Some intestines near the uterus had also been cut. In Dr. Teas's opinion, the main cause of Evans's death was the gunshot wound to her head. The multiple stab and incised wounds were contributing causes. Dr. Teas further opined that Evans's wounds were consistent with having been caused by the poultry shears. On cross-examination, Dr. Teas testified that a registered nurse, as opposed to a licensed practical nurse or a certified nurse assistant, may have a little more specific knowledge of where to make

surgical incisions, such as those required for a caesarian section.  Caffey testified later at trial that he believed Williams was a nurse.

Dr. Teas testified that Samantha had seven stab and incised wounds on her neck.  Samantha also had some incised wounds on her left arm, which Dr. Teas opined were defense wounds.  Such wounds, she explained, "are seen on victims as they are either trying to ward off the assailant or trying to protect a vital part of their body."  *Id.* at C-9255.  According to Dr. Teas, the cause of Samantha's death was multiple stab wounds.  Samantha's injuries were also consistent with having been caused by the poultry shears.

Dr. Lawrence Cogan testified that he performed Joshua's autopsy.  Dr. Cogan stated that Joshua had ligature marks on his neck, which indicated strangulation.  The marks were consistent with having been made by an object consistent with a coaxial cable.  He also testified that Joshua had a mark on his neck from the clothing tag on his shirt.  This suggested that the ligature may have been placed over clothing or that clothing may have been caught on the ligature.

There were also several stab wounds to Joshua's neck.  Dr. Cogan explained that Joshua's left lung must have collapsed from the stab wounds while he was still alive.  He further explained that Joshua's had an aspirated right lung, which meant that he had inhaled his own vomit.  Dr. Cogan opined that the unusual damage to Joshua's lung tissue from the aspirated stomach contents was consistent with the ingestion of iodine.  He also testified that Joshua had no defense wounds, which could be the result of having been restrained.  Joshua's stab wounds also suggested that "Joshua Evans's body was not moving vis-à-vis the assailant."  *Id.* at C-9340.  Dr. Cogan further stated

13

that Joshua's wounds were consistent with the butcher knife found in Caffey and Williams's home. In Dr. Cogan's opinion, Joshua died from multiple injuries: strangulation, stab wounds, and the aspiration of his stomach contents.

Dr. Christopher Olson, Evans's obstetrician and gynecologist, testified that when a caesarean section is performed in the appropriate medical manner, three people are required to deliver a child. At a minimum, more than two hands are needed to deliver a baby by caesarean section. On cross-examination, Dr. Olson agreed that someone who had a caesarean section before would have a general idea of how one is performed.

Dr. Olson also stated that for a fetus to survive, it would have to be removed from a nonbreathing mother within four minutes. In Dr. Olson's opinion, Evans was still alive when Elijah was removed from her body, because Elijah survived and the blood spatters around her body suggested a certain amount of blood pressure, which indicated that her heart was still beating at the time.

Various individuals also testified about Caffey, Williams, and Laverne Ward's activities in the months preceding the murders and their relationships with the Evans family. James Edwards testified that he had been living with Evans since 1989. Between 1989 and 1995, Edwards and Evans separated several times. During these separations, Ward, who was Williams's cousin, lived with Evans and fathered Jordan and Elijah. Edwards did not know that he was not Elijah's biological father. During the last few weeks before the murders, Edwards overheard Evans arguing with Ward on the phone. DNA tests conducted after the murders revealed that Ward was Elijah's biological father.

Edwards also testified that one week before the murders, Williams unexpectedly came by the Evans apartment. Williams asked for Evans and then had a conversation with Edwards. Williams asked Edwards what time he went to work and how he traveled there. Edwards told her that he worked from about 6 p.m. to 2:30 a.m. and that he walked to work.

Dawn Killeen, who in early 1995 lived two buildings down from Caffey and Williams in Villa Park, testified that Caffey and Ward regularly visited her apartment. Caffey dealt drugs with Killeen's husband, and Ward was Caffey's courier. Killeen admitted that at the time, she used cocaine.

Killeen testified that in May 1995, she went to Caffey and Williams's home to borrow a vacuum cleaner. She did not use cocaine that day. She saw a "bleached bottle blond" woman and her boyfriend sitting on the living room couch. *Id.* at C-8885. Laverne Ward entered the apartment, "yelling and screaming that Debbie wasn't allowing him to see Jordan." *Id.* at C-8887. According to Killeen, Ward "said he was tired of her shit and he wanted to end it. He wanted to solve the problem. He wanted to kill the bitch." *Id.* at C-8888. Ward then punched a hole in the wall between the living room and kitchen, and Williams called for Caffey to come downstairs. Killeen testified that Caffey asked Ward if he wanted a gun or a knife. Williams told Ward to calm down because he would be the most likely suspect.

Killeen testified that Caffey, Williams, and Ward then moved to another room. Killeen heard someone where they were standing talk about a baby and "whether they still want the baby." *Id.* at C-8895. The man who had been sitting on the couch was summoned into the room, and he subsequently called out for Iacullo to join them.

15

Killeen testified that the man and Iacullo said they still wanted the baby and that they had the money.

Killeen admitted that prior to 1995, she was charged with retail theft, a crime for which she served probation. In 1996, she was charged with deceptive practices for writing bad checks and with obstructing justice for hiding someone for whom the police were looking. She served jail time and was on probation for these crimes as well. Killeen testified that she had been sober for nearly three years.

On cross-examination, Killeen testified that she did not actually think that Caffey was serious when he asked Ward whether he wanted a gun or a knife. She claimed that although she was using cocaine once or twice a week at the time, it did not affect her memory. Killeen explained that she remembered exactly what was said because she argued with her husband about it, and she said she no longer wanted Caffey coming to her home because "they're capable of killing somebody." *Id.* at C-8927.

Evidence technician Steve Ruggiero testified that he visited Caffey and Williams's former apartment in Villa Park. He discovered patchwork covering up a hole in the common wall between the living room and kitchen. On cross-examination, he admitted that he did not ask the building owner when the patchwork had been completed.

John Pettaway, Williams's cousin, testified that he saw Caffey, Williams, and Ward together during the afternoon of November 16, 1995. As Pettaway and Ward were driving to Pettaway's brother's home, Ward saw Caffey and asked Pettaway to stop. Caffey and Williams were in a car parked in a lot. Ward exited Pettaway's car and spoke with Caffey and Williams for approximately ten to fifteen minutes. Afterwards,

Ward returned to Pettaway's car, and they went to Pettaway's brother's home. While there, Ward told Pettaway that he needed to find Caffey. As they were walking out the door, they saw Caffey and Williams driving down the street. Caffey and Williams pulled to one side. Ward went to their car and had a conversation with Caffey and Williams for approximately twenty minutes. Caffey and Williams then drove away. Ward and Pettaway drove to a store where Ward's girlfriend worked because Ward said he needed to get money from her. Ward and Pettaway then went to a friend's house, where they smoked crack cocaine. While there, Ward again told Pettaway that he had to meet Caffey. Pettaway drove Ward to a school that, unbeknownst to him, Williams's children attended. They waited for ten minutes but never saw Caffey. Pettaway further testified that the following day, he saw Williams at a car wash with her daughter, who was vacuuming the back seat of the car.

Kasandra Turner testified that she had known Caffey and Williams for about a year before she learned in the spring of 1995 that Williams was pregnant. On November 16, 1995, between 5:30 p.m. and 6 p.m., Turner received a call from Caffey. Caffey told Turner that he and Williams were going to have the baby and that they "have to go do something first." *Id.* at C-8831. Turner testified that she told Caffey to call and let her know when they had the baby. On November 17, a friend of Turner's informed her that Williams had the baby. Turner paged Williams. Caffey called Turner back saying that they had a baby boy and that he was "real light skinned." *Id.* at C-8832.

Turner testified on cross-examination that she knew Caffey was a drug dealer. She also testified that she did not relay to the police the conversation she had with Caffey on November 16 until January 14, 1996.

Williams's sister, Tina Martin, shared a house with her mother in Wheaton. She testified that she learned Williams was pregnant in April 1995 and that she threw a baby shower for Williams. She further testified that around 6:50 p.m. on November 16, 1995, Ward came to the house and made a telephone call to Evans. Tina overheard a portion of their conversation, during which Ward asked, "Is it his or is it mine?" *Id.* at C-9426. Ward left around 8:10 p.m.

Jacci Sullivan, who lived in Evans's apartment complex, testified that she heard a shot between 8:30 and 9:30 p.m. on November 16, 1995. Her window was partially open. Sullivan testified that she had seen Caffey in the apartment complex's parking lot in the summer of 1995, though on cross-examination she admitted that she had only seen the side of his face. Tennie Clay, who also lived in the apartment complex, testified that around 9:15 p.m., she heard voices outside which led her to look out the window. For a few minutes, she watched four people standing on a sidewalk talking to each other. She initially believed they were all African-American, but she noticed that one individual's face was very light. Three of them were wearing black, hooded sweatshirts or jackets; one of them was wearing a dark-colored Starter jacket. On cross-examination, Clay admitted that she was unable to identify Caffey from a photo line-up as one of the individuals she had seen on November 16.

Joy Wilson, age 15, and Tiffany Wilson, age 16, testified that they were baby-sitting at Tiffany's house on the night of November 16. Tiffany is Joy's aunt and a cousin of Ward and Williams. Joy testified that she and Tiffany were in the living room watching sports on television when Ward, who "looked suspicious," entered the house with a plastic grocery bag that looked like it had clothes in it. *Id.* at C-9023. Joy noticed

18

that his pants had a hole in the knee and that there was blood on his clothes. Ward went directly to the bathroom.

According to Joy, Ward emerged from the bathroom wearing different clothes, and the grocery bag appeared fuller. The family dog then frightened Joy and caused her to run outside. She saw a four-door gray automobile with three people inside: two men in the front and one woman in the back. One of the men had a goatee and neck-length braids in his hair. Joy also noticed a dent on the front driver's side of the car. Carrying the bag, Ward got in the car, and they left. A few days later, Joy saw Caffey's picture in the newspaper and identified him as the man she had seen the night of November 16. On cross-examination, Joy admitted that she had testified before the grand jury that she recognized Caffey because he had come by her uncle Bo Wilson's house. She explained that her testimony to the grand jury was misinterpreted, that she had only heard that Caffey had come by Bo's house, and that she had never seen Caffey before November 16.

Tiffany Wilson testified regarding the same events. She did not see Ward's clothing when he entered the apartment, but she did see him carrying a plastic grocery bag which appeared fuller when he emerged from the bathroom. Tiffany also noticed that he had changed his pants. On cross-examination, Tiffany testified that Joy was not watching television with her. Rather, Joy was in Tiffany's room cleaning up after the children. She further testified that Joy had gone outside, but she admitted that she had testified at the grand jury hearing that Joy had seen Ward get into a car from a window in the apartment.

Mohammid Siddiqui, an employee at 7-Eleven in Schaumburg, testified that between 1:30 and 2 a.m. on November 17, he saw Caffey and a woman matching Williams's description enter the store. Caffey bought baby wipes and candy. Rashid Siddiqui, the store owner, testified that the store register tape recorded a sale at 1:49 a.m. for one item at $1.99, which was the price of baby wipes, and one item at $0.99.

Tina Martin testified that at approximately 1 a.m. on November 17, she received a telephone call from Caffey. Tina testified that Caffey asked her to page Williams because he did not know where she was. At 3:30 a.m., Williams called Tina to say she had just given birth. Iacullo got on the phone next and also stated that Williams had given birth. Tina asked Iacullo to put Caffey on the phone. When Caffey picked up the phone, Tina asked if a baby was really there. Caffey said yes. Tina testified that she and her mother then went to Iacullo's home to see the baby. Upon arrival, Iacullo explained that Williams had come to Iacullo's house and had gone into labor and that Iacullo rushed her to the hospital. Iacullo gave this explanation in Caffey's presence. When Tina saw the baby, she asked Iacullo, "[I]s this your baby, because he's really light?" *Id.* at C-9429. After about five minutes, Tina and her mother went home, and Tina called some hospitals to determine if Williams had given birth there.

The theory of Caffey's defense was that Williams was possessive and jealous of Caffey and that she planned to cement her relationship with Caffey by claiming to be pregnant. Because of this, the defense contended, Williams had conspired with Ward and Iacullo to take Elijah and present him to Caffey as his own child.

To that end, the defense provided evidence of Williams's inability to get pregnant, her jealous nature, and evidence that she feigned pregnancies. Cynthia Sawyer, a

friend of Evans, testified that Williams told her in 1993 that she had received a tubal ligation. The parties stipulated that hospital records showed that on September 2, 1986, Williams had a baby by caesarian section and concurrently had a tubal ligation.

Kimberly Young, a friend of Williams for thirteen years, testified that she witnessed verbal and physical altercations between Williams and Katrina Montgomery, Caffey's ex-girlfriend with whom he had a child. At one point, Williams and Katrina "were in the grass pulling hair, fighting and struggling" with each other. *Id.* at C-10208. Williams also slashed Caffey's tires once when she discovered that he was out with Katrina. According to Young, Williams told Caffey to "tell that 'B' to leave me alone or I'll hurt her." *Id.* at C-10209.

Young also testified that Williams had made false claims of pregnancy three times. The first time, Williams claimed she had a miscarriage. The second time, she admitted she was pretending. The third time, Williams claimed it was true. Young testified that she believed Williams because Williams's face was swollen, her belly was protruding, and she looked like she was pregnant. Young even attended Williams's baby shower. On cross-examination, Young testified that Williams had at various times changed what she said was her due date. She also testified that when Caffey arrived at the end of the baby shower, he told everyone there that Williams had given the wrong due date and that her due date was in late October.

Katrina Montgomery also testified that she had fights with Williams and that she heard Williams claim that she was pregnant. Once, Katrina stopped fighting Williams when Williams said "her stomach hurt" and that "her baby hurt." *Id.* at C-10257. Katrina testified that Williams had threatened to kill Katrina and her daughter. She further

testified that once, while Caffey was at her home to see his daughter, Williams threw a brick through the window. Katrina's mother, who Katrina lived with, testified about this incident as well.

The defense also introduced evidence tending to show Iacullo's involvement in the murders. Stanley Rhoads, who knew Iacullo and Dorothy Hale, testified that Iacullo showed him a gun in a plastic bag with documents. Hale was also present. Iacullo said that she wanted to throw the gun into a body of water. Hale burned the documents in Rhoads's kitchen, except for one, which appeared to be a birth certificate with the name "Caffey" on it. Iacullo's ex-boyfriend, Mike Gingotta, testified that in late November or early December of 1995, Iacullo told him during a telephone conversation that "she had given them the gun to use." *Id.* at C-10454. Iacullo told Gingotta that she and Hale disposed of the gun by throwing it in a pond.

Caffey testified on his own behalf. Caffey stated that he was born in 1973 and was raised by his mother and grandparents in Maywood. He met Katrina Montgomery during his sophomore year of high school. In 1993, they had a daughter, Vanessa. Caffey did not go to any of Katrina's doctor appointments while she was pregnant, but he was present for Vanessa's birth.

Caffey graduated from high school in 1992 and worked at United Parcel Service for nine months. About one month before he quit, Caffey testified, he started selling drugs. Caffey began dating Williams in the spring of 1994. He continued to have a sexual relationship with Katrina and other women while he was living with Williams. Caffey testified that because Williams was jealous of Katrina's relationship with him, Williams had physical and verbal altercations with Katrina from 1994 through 1995.

22

In February 1995, Caffey testified, Williams told him that she was pregnant. Caffey said that he did not know that Williams could not have children. He testified that Williams had previously tricked him into believing that she was pregnant. For instance, in July 1994, Williams left a positive home pregnancy test on the dresser and claimed she was pregnant, but in December 1994 told Caffey that she had an abortion. Caffey further testified that he did not learn that Williams had given birth by caesarian section until October 1994. He did not want to have a child with Williams because he did not expect his relationship with her to go very far.

Caffey testified that by early 1995, Williams "started getting bigger." *Id.* at C-10789. Williams explained to Caffey that she did not need to see a doctor because she was a nurse and could take care of herself. She first told Caffey that her due date was in August. When she did not give birth, Williams said her due date was October 14. When the baby never came, Caffey said, he stopped believing Williams was pregnant. Caffey said that he had told Williams that he did not want to hear that she was pregnant anymore.

Caffey next gave an account of the circumstances surrounding the day of the murders. He testified that around noon on November 16, 1995, he and Williams went to a store to buy a birthday gift for Williams's daughter Christina. He was carrying drugs with him in the event anyone paged him looking to buy drugs. Caffey and Williams then picked up Williams's daughters from school, and they drove to Williams's son's middle school to pick him up for a basketball game. On the way there, Caffey saw Ward and Pettaway, and he sold drugs to Ward. They arrived at the school, picked up Williams's son, and drove to the basketball game. The game was delayed. Caffey and Williams

dropped off the children and left again. While driving, Caffey again saw and stopped to talk to Ward, who this time complained about the quality of the drugs that Caffey had sold him. Caffey and Williams eventually went back to the basketball game, which ended at approximately 7 p.m. Caffey, Williams, and the children returned home. Williams left shortly thereafter to attend a class. He expected her to return home around 9:30 p.m. Between 8 and 9 p.m., Caffey watched television with Christina. After Christina went to bed around 10 p.m., Pettaway came over to buy drugs.

Caffey admitted that he had telephoned Kasandra Turner earlier that evening. However, he denied having told her that he and Williams were going to have a baby. Caffey testified that Turner had bought drugs from him the previous day and had paid for them with a check. Caffey said that he called Turner to inform her that the check had bounced.

At 1:30 a.m. on November 17, Caffey testified, he was worried because Williams had not yet returned home. He stated that he drove to a nearby 7-Eleven store and called Tina Martin from a payphone. He asked Tina to page Williams. Caffey stated that he then telephoned Iacullo and returned home.

Caffey testified that around 2:30 a.m., Iacullo drove her car into his driveway. Caffey opened the front door, and Iacullo said, "[S]urprise, Fedell Jr." *Id.* at C-10831. Caffey went to Iacullo's car and saw Williams holding a baby. Once inside, Iacullo told Caffey that Williams was at Iacullo's house when she went into labor. Iacullo drove Williams to a hospital, where she had the baby. Williams had to leave the hospital, however, because she did not have health insurance. Caffey testified that he was skeptical of Iacullo's story but that seeing the baby's umbilical cord bleeding convinced

him that it was true. Caffey testified that he, Williams, and Iacullo then took the baby to Iacullo's house to retrieve Williams's car. From the house, Williams telephoned Tina and told her she had the baby. Tina and other friends of Caffey's came to Iacullo's home to see the baby.

Caffey testified that he and Williams left Iacullo's home and drove to the same 7-Eleven store where Caffey had been earlier. Caffey testified that he bought baby wipes there. They returned home at approximately 5 a.m. Caffey stated that he fell asleep next to the baby.

Caffey testified that he awoke at around noon, ran an errand with Williams and the baby, and returned home between 1:30 and 2 p.m. Williams then left to pick up her children from school. Caffey testified that he stayed home with the baby. Williams returned with the children around 4:30 p.m. and told Caffey that Evans and members of her family had been murdered.

At 8:50 p.m., Iacullo paged Caffey. Caffey testified that he, Williams, and the baby went to Iacullo's house. Caffey initially stayed in the car with the baby. After twenty minutes, he said, he went inside. Iacullo gave Caffey a Grambling Tigers jacket, calling it a "Daddy's Day present." *Id.* at C-10851. Caffey testified that he had left home without a coat because their car was sufficiently heated. He and Williams returned home, where they were arrested.

On cross-examination, Caffey testified that he was familiar with, and had "partied" in, the alley where Joshua's body was found. He also testified that he did not initially see Williams's caesarian section scar because Williams was overweight. Caffey had bought a gray Mercury Sable approximately one week before his arrest, but he

testified that he had not looked in the back seat when he bought it.  He said that he was in an accident that damaged the front corner on the driver's side of the car.  Caffey stated that on November 17, 1995, he never saw any blood, nor did he smell anything suspicious, in the back seat of the car, even though the baby was in a car seat in the back.

The jury found Caffey guilty of first-degree murder of Debra Evans, Samantha, and Joshua.  The jury also found Caffey guilty of the aggravated kidnapping of Joshua.

## B.     Appeal and post-conviction proceedings

In February 2000, Caffey, who was still under a death sentence, appealed his conviction to the Illinois Supreme Court.  He argued, among other things, that:  (1) he was denied his right to present a defense because the trial court improperly excluded hearsay statements made by Ward and Williams; (2) his right to present a defense was violated because the trial court improperly excluded hearsay statements by Iacullo that were self-incriminating and against her interests; (3) his trial counsel was constitutionally ineffective for failing to introduce into evidence certain statements by Iacullo and Hale that the trial court had found admissible in pretrial rulings; and (4) the trial court improperly admitted Joshua's hearsay statements naming Caffey as one of the burglars who entered his home.  On October 18, 2001, the Illinois Supreme Court affirmed the trial court's conviction.  The U.S. Supreme Court denied Caffey's petition for a writ of certiorari.

In April 2000, while his direct appeal was pending, Caffey filed a post-conviction petition in the Circuit Court of DuPage County.  In the petition, Caffey asserted a number of new claims.  Among them was a claim that the prosecution had violated its

obligations under *Brady* by failing to disclose the following: (1) that Pruitt received a benefit of non-prosecution for his participation in drug transactions with DuPage County Assistant State's Attorney (ASA) Jeffrey Kendall and also received favorable treatment while he was at DuPage County Jail; (2) that ASA Thomas Epach interceded to prevent Cook County from prosecuting Scott for Joshua's murder; and (3) that Cara Walker told police that Iacullo sold drugs to Kendall and that Iacullo said that she would reveal this information if charged with murder.

In April 2001, the state trial court dismissed all of Caffey's claims except for his *Brady* claim involving Pruitt. The court initially ordered an evidentiary hearing on that claim but later vacated that order after the prosecution sought reconsideration. In July 2005, the trial court dismissed Caffey's petition in its entirety.

The Illinois Appellate Court affirmed the lower court's dismissal of Caffey's petition. The court determined that any undisclosed benefits that Pruitt allegedly received in exchange for his testimony against Caffey were not material under *Brady*. It affirmed the dismissal of Caffey's *Brady* claims regarding Scott and Iacullo, holding that, pursuant to 725 ILCS 5/122-2, Caffey's "failure to attach the required supporting materials or to explain their absence justifies the dismissal of the post-conviction petition." *Caffey II*, slip op. at 53, 62. The Illinois Supreme Court denied Caffey's petition for leave to appeal.

## C.    Caffey's habeas corpus petition

On September 3, 2009, Caffey filed the present habeas corpus petition. Caffey asserts five claims. First, Caffey alleges that he was denied his constitutional right to present a defense and cross-examine witnesses by the trial judge's exclusion of a

number of out-of-court statements made by Ward and Williams.  Second, Caffey argues

that he was also denied his right to present a defense by the trial judge's exclusion of

certain out-of-court statements made by Iacullo that Caffey contends were against her

penal interest.  Third, Caffey contends that he was denied the effective assistance of

counsel because of trial counsel's failure to introduce into evidence certain statements

made by Iacullo and Hale that the trial judge had previously found admissible.  Fourth,

Caffey alleges that Joshua's hearsay statement naming Caffey as one of the burglars

should not have been admitted because it did not possess sufficient indicia of reliability

to satisfy the requirements of the Confrontation Clause of the Sixth Amendment.  Fifth,

Caffey alleges that the prosecution wrongfully withheld evidence involving Pruitt, Scott,

and Iacullo that was favorable and material to his defense, in violation of *Brady*.

After respondent answered Caffey's petition, Caffey requested, and this Court

granted, an evidentiary hearing to further develop the factual bases for his *Brady* claims

relating to Patrice Scott and Vikki Iacullo.  *See Caffey III*, 2012 WL 5230298, at *15.

Following discovery, Caffey withdrew the portion of his *Brady* claim concerning

evidence involving Scott.

## Discussion

A petitioner is entitled to a writ of habeas corpus if he is being held under a state

court judgment obtained in violation of the Constitution or laws of the United States.  28

U.S.C. § 2254(a).  A federal court may issue a writ of habeas corpus on a claim that

was adjudicated on the merits in state court proceedings only if the state court's

decision (1) was "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *Id.* § 2254(d)(1)–(2); *Griffin v. Pierce*, 622 F.3d 831, 841 (7th Cir. 2010).

A state court decision is "contrary to" clearly established federal law within the meaning of section 2254(d)(1) if the state court "applies a rule that contradicts the governing law set forth" by the Supreme Court or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court unreasonably applies governing law "if it identifies the correct governing legal principle [from the Supreme Court's decisions] but unreasonably applies that principle to the facts of petitioner's case, or if it unreasonably refuses to extend a principle to a context in which it should apply." *Griffin*, 622 F.3d at 841 (internal quotation marks omitted) (citing *Williams,* 529 U.S. at 407).

A state court's failure to cite or rely on federal precedent does not entitle a petitioner to relief, so long as the state court made its determination pursuant to an equivalent or more stringent state standard. *See Early v. Packer*, 537 U.S. 3, 8 (2002); *Ebert v. Gaetz*, 610 F.3d 404, 413 (7th Cir. 2010); *Virsneiks v. Smith*, 521 F.3d 707, 714 n.7 (7th Cir. 2008). Indeed, a state court "need not even be aware of [U.S. Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). The state court's reliance on state-law analysis will suffice under section 2254(d) so long as the analysis is consistent with U.S. Supreme Court precedent. *Gilbert v. Merchant*, 488 F.3d 780, 793 n.2 (7th Cir. 2007).

A federal court reviews *de novo* a constitutional claim that the state court did not adjudicate on the merits. *See, e.g., Byers v. Basinger*, 610 F.3d 980, 989 n.6 (7th Cir. 2010); *Gonzalez v. Mize*, 565 F.3d 373, 384-85 (7th Cir. 2009); *see also* 28 U.S.C. § 2254(d) (limiting deference to "any claim that was adjudicated on the merits in State court proceedings.").

As indicated earlier, Caffey withdrew his claim that the prosecution wrongfully withheld evidence of Scott's statements to police in violation of *Brady*, and thus the Court will not address that claim. Of the remaining claims, the state courts addressed the merits of the first four claims in Caffey's habeas petition – namely, his two claims asserting violation of his right to present a defense, his ineffective assistance of counsel claim, and his Confrontation Clause claim. The state courts also reached the merits of Caffey's *Brady* claim involving Pruitt's favorable treatment by the State. The state appellate court did not, however, reach the merits of Caffey's *Brady* claim involving Iacullo.

## I.   Right to present a defense:  out-of-court statements by Ward and Williams

Caffey contends that he was denied his Sixth Amendment right to present a defense and cross-examine witnesses by the trial court's exclusion of out-of-court statements made by Ward and Williams. The Sixth Amendment's Compulsory Process Clause "embodies a substantive right to present a meaningful and complete criminal defense." *Harris v. Thompson*, 698 F.3d 609, 626 (7th Cir. 2012) (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) and *Taylor v. Illinois*, 484 U.S. 400, 408 (1988)). This includes the right to offer the testimony of defense witnesses and to compel their attendance. *Id.* (citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)).

These rights, of course, are not unlimited.  The defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability."  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).   And although a court "may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor," the "countervailing public interest[ ]" in the "integrity of the adversary process, which depends both on the presentation of reliable evidence and rejection of unreliable evidence, . . . must also weigh in the balance."  *Taylor*, 484 U.S. at 410, 414, 415; *see Harris*, 698 F.3d at 626.

In *Chambers*, however, the Supreme Court concluded that in the circumstances of that case, the state's rule prohibiting hearsay gave way to the requirements of due process and the Sixth Amendment.  Specifically, the Court ruled that excluding hearsay that was material to the defendant's defense and that "bore persuasive assurances of trustworthiness" violated the defendant's right to a fair trial.  *Chambers*, 410 U.S. at 302.  To establish a violation of due process / compulsory process requirements in this context, Caffey "must show that (1) the testimony would have been both material and favorable to [his] defense, and (2) that the exclusion was arbitrary or disproportionate to the evidentiary purpose advanced by the exclusion."  *Harris*, 698 F.3d at 627 (internal quotation marks and citations omitted).

### A.    Pettaway's testimony about Ward's statement

Caffey first argues that the state court improperly excluded John Pettaway's testimony that, on the afternoon of the murders, Laverne Ward told Pettaway that he needed to find Caffey to buy drugs from him.  Caffey contends that this evidence would

have enabled the defense to refute the prosecution's theory that he and Ward met to discuss the murders.

The Illinois Supreme Court noted that this issue concerned Caffey's "due process right to present a defense," *Caffey I*, 205 Ill. 2d at 90, 792 N.E.2d at 1188, but despite that, the court did not address Caffey's argument in constitutional terms. Rather, it dealt with it as a matter of state hearsay law. The court concluded that the statement was hearsay and was not admissible under certain exceptions to the hearsay rule. *Id.* at 90-91, 792 N.E.2d at 1189. In addressing these exceptions, the court stated that an "abundant" amount of evidence was admitted from which defense counsel could have argued that Ward and Caffey met that day to deal drugs. *Id.* at 91, 792 N.E.2d at 1189. The court cited Pettaway's testimony that he and Ward had smoked crack cocaine together; he knew that Caffey was a drug dealer; he had previously bought drugs from Caffey; and he had seen Ward buy drugs from Caffey. The court also pointed to Caffey's own testimony that he sold crack cocaine to Ward at the first of multiple meetings they had on November 16. *Id.* In dealing with a separate hearsay exception, the court stated that even if the evidence should have been admitted, the error was harmless. The court again pointed to Pettaway's testimony regarding his drug relationship with Ward and Caffey, as well as Caffey's own testimony that he sold drugs to Ward. It concluded that this testimony "was at least as strong as Ward's excluded hearsay statement." *Id.* at 92-93, 792 N.E.2d at 1190.

Caffey contends that the Illinois Supreme Court's decision was both contrary to, and an unreasonable application of, *Chambers*. The state court did not employ a *Chambers* analysis, but it acknowledged the federal constitutional issue, and its

32

assessment of the harmless error issue was equivalent to the focus on materiality under *Chambers*. By concluding that any error in excluding the evidence was harmless, the court essentially ruled that Ward's statement was not material or, as *Chambers* put it, "critical."[4] *Chambers*, 410 U.S. at 302. The state supreme court considered this point carefully, assessing the excluded evidence in comparison with other admitted evidence on the same point. Its conclusion cannot be considered an "unreasonable application" of federal constitutional law. 28 U.S.C. § 2254(d)(1). The Court therefore overrules Caffey's claim that his right to present a defense was denied by the trial court's failure to admit Pettaway's testimony about Ward's statements.

### B. Young's testimony about Williams's statements

Caffey next argues that the trial court improperly excluded Kimberly Young's testimony that Williams told her that she faked pregnancies "to keep a man." Pet'r Br. at 21. Caffey contends that this would have provided the essential corroboration the defense needed to show that Williams fooled Caffey into believing she was pregnant so that he would not leave her.

As with Pettaway's hearsay testimony, the Illinois Supreme Court did not expressly address this issue in constitutional terms but rather considered it as a matter

---

[4] The Court hesitates to characterize Pettaway's testimony about Ward's statement as hearsay, because it plainly was offered not to prove the truth of the matter asserted in the statement, but rather to show Ward's intention regarding further actions. Illinois, however, does not appear to follow the so-called "*Hillmon*" rule, under which an out-of-court statement offered to show the declarant's intention is not considered to be hearsay and is admissible without more. *See generally Mut. Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295-96 (1892). Rather, the Illinois Supreme Court appears to impose more stringent requirements including unavailability of the declarant and a reasonable probability that the declarant's statement was true. *See People v. Floyd*, 103 Ill. 2d 541, 546, 470 N.E.2d 293, 295 (1984). *See generally People v. Hansen*, 327 Ill. App. 3d 1012, 1022-23, 765 N.E.2d 1033, 1042-43 (2002); *People v. Nyberg*, 275 Ill. App. 3d 570, 586, 656 N.E.2d 65, 77-78 (1995) (Wolfson, J., concurring) (criticizing the apparent Illinois rule).

of state hearsay law. The court first concluded that certain hearsay exceptions did not apply and then found that even if the testimony was erroneously excluded, any error was harmless. In this regard, the court stated that Caffey had presented "much additional evidence regarding Williams deceiving others, including [Caffey], with her lies of being pregnant." *Caffey I*, 205 Ill. 2d at 93-94, 792 N.E.2d at 1190. The court noted, for instance, that Caffey had presented evidence to the jury that Williams was jealous and possessive of Caffey in their relationship. Furthermore, at least three witnesses – including Williams's sister – provided evidence of Williams's lies. *Id.* at 93-94, 72 N.E.2d at 1190

As was the case with the Pettaway testimony, the Illinois Supreme Court's analysis is roughly equivalent to an analysis under *Chambers* of the extent to which the evidence was critical to the defense. To put it another way, the state court's determination that the exclusion was harmless is essentially the same as saying the evidence was not critical.

The Court cannot conclude that this determination was an unreasonable application of federal law. Although the Illinois court did not explain its reasoning in detail, the trial record contained significant evidence, in addition to the evidence the court cited, to support the defense theory that Williams lied to Caffey about being pregnant in order to keep him. For example, Young testified that although Williams had feigned pregnancies twice in the past, Williams actually looked – and Young believed Williams to be – pregnant in the fall of 1995. The record reflects that, in fact, many people believed Williams was pregnant. Williams's own sister, Tina, threw Williams a baby shower, and several others came with gifts. Young also testified that she had

witnessed Williams verbally and physically fighting over Caffey with his ex-girlfriend, Katrina Montgomery. She also testified that Williams was so jealous that she once slashed Caffey's tires when she discovered he was out with Katrina. Similarly, both Katrina and her mother testified that once, while Caffey was visiting his daughter in Katrina's home, Williams threw a large brick through her window. This evidence, in addition to Caffey's own testimony regarding Williams's jealous nature, was sufficient to support defense counsel's theory that Williams was lying not only to other people but also to Caffey about being pregnant.

Because the state court did not make an unreasonable determination regarding the significance of the excluded evidence, the Court rejects Caffey's claim that his constitutional right to present a defense was violated by the exclusion.

## II.    Right to present a defense:  out-of-court statements by Iacullo

Caffey argues that the trial court's exclusion of certain out-of-court statements by Vikki Iacullo denied him his constitutional right to present a defense. The Illinois Supreme Court described the statements as follows:

> The arrest of [Caffey] and Williams led police to question Iacullo. She gave statements to police on November 18, 1995, and several times thereafter, which included the following. Early on November 17, Williams arrived at Iacullo's house with a baby. The baby's umbilical cord was dripping blood, so Iacullo gave Williams gauze and tape. Williams was wearing a light-colored shirt that had blood on it and she had a fresh cut on her hand. Williams gave Iacullo Edwards' Grambling Tigers starter jacket and told her to give it to [Caffey] as a "new daddy present." Iacullo drove Williams to Williams' house. There, Iacullo showed [Caffey] the baby and said "surprise, Baby Fedell, Jr." Iacullo also gave the jacket to [Caffey]. Also, at Williams' behest, Iacullo prepared a false birth certificate and gave it to Williams outside of [Caffey's] presence.

*Id.* at 96, 792 N.E.2d at 1192.

This claim, like those just discussed, arises under *Chambers v. Mississippi*. As the Court has indicated, *Chambers* holds that a state hearsay or other rule excluding evidence cannot, consistent with the federal constitution, be imposed to exclude evidence that bears "persuasive assurances of trustworthiness" and that is critical to the defense of an accused. *Chambers*, 410 U.S. at 302. In *Chambers*, the Court evaluated the particular statement's trustworthiness by looking at several factors: (1) the statement was made spontaneously to a close acquaintance shortly after the crime; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating with respect to the declarant; and (4) there was an opportunity to cross-examine the declarant. *Id.* at 300-01.

In Caffey's direct appeal, the Illinois Supreme Court cited *Chambers* and assessed the factors just described, noting, correctly, that "[t]he presence of all four factors is not a condition of admissibility" and that the overriding question is whether the out-of-court statement "was made under circumstances which provide considerable assurance of its reliability by objective indicia of trustworthiness." *Caffey I*, 205 Ill. 2d at 97, 792 N.E.2d at 1192. The state court held that Caffey satisfied the second *Chambers* factor. The first and fourth factors are not at issue; Caffey does not contend that Iacullo made her statements to a close acquaintance or that she was available for cross-examination (Iacullo claimed her privilege against self-incrimination). Thus only the third factor – whether Iacullo's statements were self-incriminating – is disputed in this case.

The state supreme court found that nearly all of Iacullo's statements to the police were not self-inculpatory, with one exception that the court considered minor.

Specifically, the court stated that "[t]here is no crime in:  allowing into one's home a friend who claims to have just given birth; helping to bandage a baby; driving that friend to her home and presenting the baby to the alleged father; or giving someone a jacket." *Caffey*, 205 Ill. 2d at 99, 792 N.E.2d at 1194.  The court acknowledged that Iacullo's statement regarding preparation of a false birth certificate was "somewhat incriminating."  *Id.*  It concluded, however, that because Williams initiated the request for false paperwork, the statement implicated Williams as the central figure and was not really against Iacullo's self-interest.

In *Williamson v. United States*, 512 U.S. 594 (1994), the Supreme Court explained that "whether a statement is self-inculpatory or not can only be determined by viewing it in context."  *Id.* at 603.  The Court noted that some statements, though appearing neutral on their face, could actually be against the declarant's interest.  The relevant inquiry "is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances."  *Id.* at 603-04 (quoting Fed. R. Evid. 804(b)(3)).

By viewing each one of Iacullo's statements individually and only on its face rather than in light of the statements' context and surrounding circumstances, the state court unreasonably applied *Williamson*, even though it cited that case.  *See Caffey I*, 205 Ill. 2d at 99, 792 N.E.2d at 1193.  Iacullo made the statements in question to the police on November 18, December 1, and December 2, 1995.  The record makes clear that at the time Iacullo made these statements, she knew that the police had already

arrested Williams and Caffey for kidnapping Elijah; that Caffey had mentioned her name to the police; and that based on their line of questioning, the police thought she was involved. Iacullo also knew at the time that the baby who had been brought to her house had been kidnapped, the suspects had been arrested, and she was already being investigated by the police. Any reasonable person in her position would have understood that placing herself with the prime suspects and the kidnapped baby on the day after Evans's murder would tend to implicate her in the crime. Indeed, Iacullo's statements at issue here put her even more at risk, as they suggested further involvement, including preparing a false birth certificate. Rather than looking at the totality of the circumstances – as *Williamson* put it, the "context" of the statements – the state court parsed Iacullo's statements by evaluating each aspect independently. This was an unreasonable application of the straightforward requirements of *Williamson.*

The Court therefore assesses *de novo* whether the state trial court violated Caffey's constitutional rights by excluding Iacullo's statement. The Court concludes that the statements bore considerable assurances of trustworthiness when assessed in the way that *Williamson* requires. Given the circumstances just discussed, no reasonable person in Iacullo's position would have made statements to the police tying herself even more closely to the accused perpetrators unless those statements were true. Iacullo's statements that are at issue were also corroborated by other evidence that was admitted at Caffey's trial, as discussed earlier. The statements thus met the threshold requirements for admissibility under *Chambers* and its progeny.

Because the state supreme court did not find Iacullo's statements trustworthy, it did not consider their materiality. The Court therefore considers that question *de novo.*

As the Seventh Circuit noted in *Harris*, the Supreme Court has "imported the materiality requirement of the *Brady v. Maryland* line of cases into the Compulsory Process Clause analysis." *Harris*, 698 F.3d at 627. Under this standard, "the exclusion of a witness is material 'only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact.'" *Id.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 874 (1982)).

The issue of materiality is a closer question for the Iacullo statements than it was for the excluded hearsay statements made by Ward and Williams. In arguing for Caffey's guilt, the prosecution placed significant weight on the fact that Caffey was wearing the Grambling jacket at the time of his arrest. The exclusion of Iacullo's statements to law enforcement enabled the prosecution to argue in closing argument that the jury should disbelieve Caffey's testimony that Iacullo had given him the jacket:

> He has to explain to you how he is wearing that coat. Annette Williams is wearing it earlier. They took it together. They were in the Addison apartment together. They both had the coat just like they both had the baby. But he has to come up with a story how did I get this coat? Vicky Iacullo. Does that make any sense? . . . [B]ased on all the evidence in this case you cannot and you must not accept that ridiculous ludicrous explanation that Vicky Iacullo *for reasons we have never been presented* . . . planted this evidence on him.

Resp't Ex. R at C-11359 (emphasis added0).

The admission of Iacullo's statements to the police would have provided corroboration for Caffey's testimony that Iacullo had given him the jacket. This, in turn, would have provided some support for the proposition that rather than being a perpetrator, Caffey was duped by Williams, one of the actual perpetrators. The statements would have further undermined the prosecution's theory that Caffey took the jacket from Evans's apartment, or that he was ever there.

On the other hand, the prosecution presented a substantial amount of evidence of Caffey's guilt. Both Scott and Pruitt testified that Joshua identified Caffey as one of the four burglars who had "cut" his mother and sister. Pruitt also testified that she watched Caffey strangle and later viciously kill Joshua. Tennie Clay, a neighbor of the Evans family, testified that on the night of the murders, she saw a light-skinned individual matching Caffey's complexion with three other African-Americans, one of whom was wearing a Starter jacket. Joy Wilson also testified that at approximately 10 p.m. on November 16, she saw Caffey in his gray car with Williams and Ward, who was wearing bloodstained clothing. A clerk at the 7-Eleven in Schaumburg, Mohammid Siddiqui, testified that on November 17 at approximately 1:37 a.m., Caffey bought baby wipes and came to the store in a car along with a person matching a general description of Williams. This contradicted Caffey's story that at that time, he was alone and making a phone call from the store's parking lot in an effort to locate Williams.

In addition to this eyewitness testimony, the prosecution presented significant circumstantial evidence. Kasandra Turner testified that on November 16 at approximately 6 p.m., Caffey called her and told her that Williams was going to have her baby. Dawn Killeen testified that she overheard Caffey ask Ward if he wanted a knife or gun when Ward said that he wanted to kill Evans. Although she did not think Caffey was serious, she no longer wanted him coming to her home because she thought he was capable of murder. Killeen also observed Caffey, Williams, and Ward together, and one of them said something about "whether they still want[ed] the baby," which suggested Caffey's involvement in planning the murders.

Finally, there was also compelling physical evidence. Dr. Cogan testified that

Joshua's stab wounds indicated that his assailant had held him down, corroborating

Scott's account of how he was killed. Additionally, police found in Caffey's home: video

game cartridges, a rope with Joshua's blood on it, a bottle of baby lotion stained with

Joshua and Elijah's blood, and a knife that experts opined caused Joshua's wounds.

Though the matter is not free from doubt, the Court concludes that Caffey has

failed to show that Iacullo's testimony is reasonably likely to have affected the jury's

determination of his guilt. The testimony would have inculpated Iacullo but would not

have significantly exculpated Caffey – among other things, it would not have

undermined Scott's eyewitness account of the brutal murder of Joshua – and it would

not have undermined the other substantial evidence of Caffey's guilt. For this reason,

the Court overrules Caffey's claim regarding the exclusion of Iacullo's out-of-court

statements to law enforcement.

## III.     Ineffective assistance of trial counsel – failure to introduce evidence

Caffey contends that his trial counsel was ineffective for failing to introduce at

trial certain out-of-court statements made by Iacullo and Hale that the trial court had

found admissible in pretrial rulings. Specifically, Caffey claims that defense counsel

could have introduced the following statements:

> Ryan Berger could have testified that on November 16, 1995, a few hours
> prior to Debra's murder, Iacullo asked him how to clean fingerprints off a
> gun. Also, between midnight and 4 a.m. on November 17, Iacullo
> telephoned Berger, asking how to clean powder burns off her hand.
> Patricia Mitchell could have testified that Iacullo told her that Iacullo saw a
> gun under the front seat of Iacullo's car and was concerned that her
> fingerprints might be on that gun.
>
> David Drenk could have testified that in the early fall of 1995, Iacullo
> asked him to loan her a gun. One day to one week prior to these crimes,

Iacullo asked Drenk if he could obtain a false birth certificate and he said no. On November 16, 1995, Drenk was at Iacullo's apartment and saw Williams there. On November 17, Iacullo asked Drenk for help in obtaining a birth certificate. On November 18, Iacullo told Drenk that she would alter a birth certificate by whiting out information and making a photocopy with the false information. A few days subsequent to these crimes, Iacullo told Drenk that she was going to throw the gun in the Fox River. Iacullo told Hale to get cleaner from under the kitchen sink to wipe fingerprints off a gun.

Lastly, Detective Joseph Lullo could have testified that he interviewed Hale on December 1, 1995. She told him that on November 26, Iacullo told Hale to use vinegar and a cloth diaper to wipe fingerprints off a gun, six bullets, and a magazine.

*Caffey I*, 205 Ill. 2d at 106-07, 792 N.E.2d at 1198.

A claim of ineffective assistance of counsel claim is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In an earlier section of its decision on Caffey's direct appeal, the Illinois Supreme Court accurately cited *Strickland* as requiring a defendant to show that his attorney's performance fell below an objective standard of reasonableness and that the attorney's deficient performance prejudiced the defendant. *Caffey I*, 205 Ill. 2d at 105, 792 N.E.2d at 1197 (citing *Strickland*, 466 U.S. at 687, 697). The state court applied *Strickland* to Caffey's present claim as follows:

We can dispose of this [claim] on the prejudice prong of *Strickland* alone. None of these hearsay statements exclude defendant from participating in these crimes. At most, they implicate Iacullo and Hale in the planning or cover up of these crimes. Implicating Iacullo and Hale does not exculpate defendant, or diminish the strong evidence of defendant's active participation in these crimes. Further, the jury knew that Iacullo and Hale were involved with the gun and the birth certificate. According, defendant suffered no prejudice in terms of *Strickland*.

*Id.* at 107, 792 N.E.2d at 1198.

This was not an unreasonable application of *Strickland's* prejudice requirement. Evidence that someone else was involved in the crimes would have done nothing to

exclude Caffey. It is true, as Caffey points out, that some of the excluded evidence (in particular, her inquiry about cleaning powder burns off her hands) arguably suggested that Iacullo had fired the gun used to shoot Debra Evans. But as the state court noted, that in no way diminished the evidence that Caffey, along with others, had directly and actively participated in the murders. Though the issue is not free from doubt, the Court concludes that the state court did not apply *Strickland's* prejudice requirement unreasonably.

## IV.     Confrontation Clause – admission of Joshua's statements

Caffey argues that the trial court's admission of Joshua's statements under the spontaneous declaration exception to the rule against admission of hearsay violated his Sixth Amendment rights to confrontation and to a fair trial because the statements did not bear sufficient "indicia of reliability." Pet'r Br. at 27. Under the Supreme Court's Confrontation Clause jurisprudence as it existed at the time of Caffey's trial and appeal, the Sixth Amendment "permit[ted], where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial." *Maryland v. Craig*, 497 U.S. 836, 847-48 (1990); *see also Idaho v. Wright*, 497 U.S. 805, 813 (1990); *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980). Under *Roberts* and its progeny, the admissibility of such out-of-court statements depended on a showing that the statement's declarant was unavailable and whether the statement bore sufficient "indicia of reliability." *Wright*, 497 U.S. at 814-15; *Roberts*, 448 U.S. at 66. Adequate indicia of reliability could be established in two ways: by showing that the hearsay statement fell within a firmly rooted hearsay exception, or by showing that it bore particularized guarantees of trustworthiness. *E.g., Wright,* 497 U.S. at 816.

43

Joshua was, of course, unavailable to testify at trial. In considering Joshua's statements, the state trial court did not directly address the requirements of the Confrontation Clause. Rather, it ruled simply that his hearsay statements were admissible under the spontaneous declaration exception to the hearsay rule. The fact that the state court did not address the constitutional issue directly is of no consequence in this situation. At the relevant time, the Supreme Court had held that the spontaneous declaration hearsay exception was a firmly rooted hearsay exception that carries "substantial guarantees of . . . trustworthiness . . . [that] cannot be recaptured even by later in-court testimony." *White v. Illinois*, 502 U.S. 346, 355-56, n.8 (1992). Under *Wright*, if Joshua's hearsay statements properly qualified as spontaneous declarations under Illinois law, their reliability could be inferred, and the admission of the statements would not violate the Confrontation Clause. *Wright*, 497 U.S. at 815 ("Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.").

In Illinois, three requirements must be met for a statement to qualify as a spontaneous declaration: (1) a sufficiently startling occurrence to produce a spontaneous and unreflecting statement, (2) an absence of time for the declarant to fabricate the statement, and (3) that the statement relate to the circumstances of the occurrence. *People v. Zwart*, 151 Ill. 2d 37, 46, 600 N.E.2d 1169, 1173 (1992). Caffey argues, as he did on direct appeal, that Joshua's statements did not fall within this exception because they "were made four to eight hours after the startling event." Pet'r Br. at 27. Although a lapse in time between the event and the statement may be relevant in determining whether the statement is a spontaneous declaration, the time

element alone is not controlling on the issue. *Gross v. Greer*, 773 F.2d 116, 120 (7th Cir. 1985) (passage of twelve hours before child's statement did not render it inadmissible given the child's shock and fear). All that the exception requires is "that the statement be made *contemporaneously with the excitement resulting from the event*, not necessarily with the event itself." *United States v. Moore*, 791 F.2d 566, 572 n.4 (7th Cir. 1986) (emphasis added).

The Illinois Supreme Court reasonably concluded that Joshua's statements qualified as spontaneous declarations and thus were admissible. The court expressly incorporated its analysis of this issue in its decision on Williams's direct appeal. *See Caffey I*, 205 Ill. 2d at 108, 792 N.E.2d at 1199. In that case, the state court first correctly identified that the issue as "whether the statement was made while the excitement of the event predominated." *People v. Williams*, 193 Ill. 2d 306, 353, 739 N.E.2d 455, 479-80 (2000) (internal quotation marks omitted). The court then highlighted the evidence indicating that although Joshua's statements were made six to nine hours after witnessing the murders of his mother and sister, the effects of the event had not dissipated. The court noted that just after Joshua witnessed the brutal murders of his mother and sister, the killers took him to a stranger's apartment in the middle of the night. Though he fell asleep, both Scott and Pruitt testified that he cried out during his sleep and awoke crying early in the morning. Joshua's frantic and scared behavior continued up to the moment that he made the challenged statements at issue. *Id.* at 355, 739 N.E.2d at 481. This evidence was sufficient to support a determination that "the excitement [of the murders] predominated" at the time Joshua made the statements at issue. *Id.*

45

For these reasons, the Court concludes that the Illinois Supreme Court reasonably found Joshua's statements admissible and therefore rejects Caffey's Confrontation Clause claim.

## V.     *Brady v. Maryland* claims

Caffey argues that he was denied due process of law because prosecutors wrongfully failed to disclose exculpatory or impeachment evidence relating to Pruitt and Iacullo in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  To establish a *Brady* violation, Caffey must show that:  "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material to an issue at trial."  *Toliver v. McCaughtry*, 539 F.3d 766, 780 (7th Cir. 2008).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995).

Caffey originally asserted three *Brady*-related claims.  The Court ordered an evidentiary hearing on two of them and permitted pre-hearing discovery on those claims.  Caffey withdrew one of the claims – Claim V-B, regarding Patrice Scott – after conducting discovery.  Thus Claim V-C, concerning Vikki Iacullo, was the only claim that was the subject of an evidentiary hearing before this Court.  Claim V-A, concerning Dwight Pruitt, was decided on its merits by the state appellate court.  The Court will discuss the Iacullo claim first and the Pruitt claim second.

## 1.     Claim V-C:  Evidence relating to Vikki Iacullo

On July 19-20, 2013, the Court held an evidentiary hearing regarding Caffey's *Brady* claim concerning Vikki Iacullo.  Caffey contends that the prosecution withheld

evidence that Cara Walker told law enforcement that Iacullo said that she had sold drugs to DuPage County prosecutors, including Jeffrey Kendall, one of the trial prosecutors, and that she would reveal this information if she was arrested or charged in connection with the murders.

This particular *Brady* claim is intertwined to some extent with Caffey's claim, discussed earlier, regarding the exclusion of Iacullo's out-of-court statements to law enforcement regarding the events of November 17. Caffey argues that if Iacullo's statements to Walker had been disclosed to him prior to trial, he could have used that evidence to buttress his argument that Iacullo's out-of-court statements to law enforcement should be admitted in evidence. First, Caffey contends, Iacullo's statements to Walker about involvement with the perpetrators would have supported his argument that Iacullo's later statements to the police were sufficiently reliable to be admitted. Second, Caffey argues that the evidence shows that the prosecution and Iacullo had an understanding (express or tacit) that if she kept quiet about her knowledge of drug use by prosecutors, she would not be charged with murder. Caffey contends that proof of this understanding would have enabled him to get Iacullo's statements to law enforcement into evidence at his trial.

The Court has concluded, in Section II of this decision, that the state supreme court acted unreasonably in determining that the Iacullo's out-of-court statements were not self-incriminating. The upshot of that conclusion, for present purposes, is that Iacullo's statements to Walker, if disclosed, would not have made a difference in a proper analysis, because Iacullo's statements to law enforcement ought to have been found to be self-incriminating even without the evidence of her statements to Walker.

The Court went on to conclude in Section II that even if Iacullo's out-of-court statements had been admitted at Caffey's trial, Caffey has failed to show a reasonable likelihood that they would have made a difference in the outcome. The upshot of that conclusion is likewise that even if disclosure of Iacullo's statements to Walker would have helped Caffey get Iacullo's statements to law enforcement into evidence, that would not have made a difference in the trial. The Court will nevertheless consider Caffey's *Brady* claim, to ensure a complete record for appellate review.

The evidence offered at the evidentiary hearing before this Court included live testimony and previous statements by Iacullo herself; deposition testimony of, and various earlier statements by Cara Walker; testimony (live or via deposition) by Catherine (Vrchota) Hundley, David Wall, Joseph Lullo, William Simmons, and Brad Telander; deposition and hearing testimony, as well as other statements, by Dwight Pruitt; testimony (live or via deposition) by Terry Ekl, Michael Goggin, Michael Wolfe, and John Kinsella; testimony by Jeffrey Kendall; evidence relating to Jamah Taylor; and other evidence. The evidence offered included certain written materials provided to the Court pursuant to Caffey's motion to expand the record (*see* Dkt. No. 90), to which no objection was interposed and which the Court granted.

The Court has carefully considered all of the evidence. The Court has made judgments regarding the reliability of the evidence submitted and the credibility of the witnesses who testified live or via deposition, based on their demeanor (with respect to their live and video-recorded statements), the reasonableness of their testimony in light of other evidence, any inconsistencies, and other factors appropriately considered in

assessing credibility. The following constitutes the Court's findings of fact and conclusions of law regarding the Iacullo-related *Brady* claim.

### a. Iacullo's claims about drug use by prosecutors and her threat to disclose it

On the weekend of November 18, 1995, Cara Walker[5] got a telephone call from Vikki Iacullo, who was with her attorney. Walker's daughter was friends with one of Iacullo's daughters. Iacullo told Walker that she was in a bit of trouble and asked if Walker could watch her daughters at Walker's home. The attorney, David Drenk, got on the telephone and repeated Iacullo's request. Walker agreed to take the girls in. They

---

[5] Respondent's counsel interposed a number of objections during the deposition of Cara Walker, which was presented as evidence at the hearing before this Court. The Court overrules each of those objections. Respondent's foundational objections and objections to leading questions are without merit and are overruled; foundations were laid sufficiently, and no inappropriate leading occurred. The remaining objections are almost entirely hearsay objections. The Court overrules these objections as well. First, the Court questions whether *any* of Walker's testimony about what Iacullo or her lawyer David Drenk said amounts to hearsay. This testimony was offered primarily to show what Walker reported to law enforcement (a key issue for *Brady* purposes) – a non-hearsay use – and only secondarily to prove the truth of what Iacullo said. That aside, respondent's hearsay objections are without merit. A number of the statements consist of directions to do something (e.g., Iacullo telling Walker she could come to Iacullo's house to get clothing for her children; Iacullo telling her children not to take anything other than clothing), which is not hearsay. *See, e.g., United States v. White*, 639 F.3d 331, 337-38 (7th Cir. 2011). Other statements are not hearsay because they are not offered for their truth (e.g., a statement by one of Iacullo's children that she did not want to talk; a statement by Walker agreeing to take the children to their grandparents; a threat by Iacullo; Detective Lullo's agreement to meet with Walker, etc.). As to any remaining statements by Iacullo or Drenk, the Court likewise overrules respondent's hearsay objections. Many of the statements in question are admissible to show Iacullo's or Drenk's then existing state of mind, meaning they are not hearsay or at least are subject to a hearsay exception. *See* Fed. R. Evid. 801(c) & 803(3); *see also, e.g., United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir. 1992); *United States vs. Peak*, 856 F.2d 825, 833-34 (7th Cir. 1988). Finally, Walker's statements that she told various law enforcement authorities what Iacullo had said are not hearsay at all. They are offered to establish the fact of reporting these statements to law enforcement – in other words, to show Walker made the statements, not their truth. *See, e.g., Dutton v. Evans*, 400 U.S. 74, 88 (1970) (no hearsay issue arises if testimony is "used to prove merely that the statement had been made"). The Court is constrained to say that it found rather inexplicable respondent's decision to object to the latter statements.

were brought to Walker's home, and they ended up staying with her for three or four days.

During the girls' stay at her home, Walker telephoned Iacullo, who gave Walker permission to bring the girls back to Iacullo's home so they could pick up some clothes to wear. While waiting with Iacullo for the girls to gather their clothes, Walker and Iacullo spoke. Iacullo told Walker that she had been dragged into something and was in trouble, and she made reference to having knowledge or involvement in a murder that was "someone else's idea." Iacullo said, in substance, that she was not going to take the heat for others, and if the authorities came after her, she would expose the fact that she had been selling narcotics to important people in DuPage County, including prosecutors and her attorney Drenk. Iacullo referred to two other names: Kendall and a name that Walker says sounded like "Consuelo."

Walker put two and two together and figured out that Iacullo was talking about the Addison murders. After returning home, she called various law enforcement agencies and reported that Iacullo had something to do with the murders and that Iacullo's children were at her (Walker's) home. Walker was later interviewed by law enforcement personnel assigned to the murder investigation. She told them what Iacullo had said, including, during at least some of these interviews, Iacullo's claim to have sold narcotics to DuPage County prosecutors and to her attorney. It is likely, though less than certain, that Iacullo mentioned Kendall's name during one or more of these interviews. Walker's statements regarding Iacullo's claims about drug dealing were not memorialized by the law enforcement personnel who interviewed her during this time frame.

The Court finds Walker's testimony about these events credible. Iacullo testified, and stated in an earlier statement to Kendall's attorney Terry Ekl, that she made no such statements to Walker, but her testimony and statement lacked credibility. Among other things, Iacullo told attorney Ekl in a video-recorded interview that she did not know Walker, but she admitted in her testimony at the hearing in court that her children may have stayed with Walker. Iacullo also made a statement to the police, not too long after the events, in which she said that on the night in question, she "found a place for my children to go to where we thought they would be safe," Iacullo Dec. 1, 1995 Statement at 59, and Drenk told the police the same thing. This inferentially confirms the premise of Walker's story. The Court also notes that Iacullo told Ekl that Walker said she had worked for "DuComm," which is virtually spot-on accurate. This also tends to confirm a connection between Iacullo and Walker.

Iacullo's description of Walker during the Ekl interview as a "crazy lady" lacks credibility, as do Iacullo's efforts to distance herself from Walker and the incriminating statements that Walker attributed to her. In addition, Iacullo has admitted both drug usage and drug dealing during the period in question, which further undermines the credibility of her denials regarding the statements Walker attributed to her. That aside, Iacullo also has a rather obvious motive to falsely deny making those statements: they suggested her involvement in the crimes of which Caffey and his co-defendants were convicted.

Walker, by contrast, had and has no plausible motive to fabricate these matters. The Court finds utterly unsupported respondent's contention that Walker wanted Iacullo to be prosecuted and fabricated the statements in question to help achieve that end. In

addition, Walker's testimony about what Iacullo said about the events surrounding the murders and her concern about exposure was amply corroborated by evidence, a good deal of it admitted at Caffey's trial, tying Iacullo to the perpetrators and to the events surrounding the murders. And Walker's statements regarding what Iacullo said about her connection to the perpetrators have not only been consistent over time, but also have been memorialized as such by the authorities.

With respect to Iacullo's claimed statements about drug usage by DuPage County prosecutors and her own lawyer, Walker has told a generally consistent story about these events from the outset – even if the "outset" is measured from the date of her first *memorialized* statement on the subject. Her story has varied on some details over time, but no more than one would expect given the passage of time.[6] These statements, to be sure, are nowhere to be found in interview memoranda prepared by law enforcement officers during the period when they were investigating the murders. The Court has considered this, along with the testimony of certain of those officers, including Hundley (formerly Vrchota), Walls, and Lullo, each of whom denied that Walker reported any such statements by Iacullo. The Court did not find these denials credible. Among other things, Hundley claimed to speak entirely from memory regarding an interview conducted over seventeen years ago during which she did not take notes. Lullo had no independent memory of his interviews of Walker other than what was in his notes. He confirmed one of the meetings during which Walker says she

---

[6] Chief Bill Simmons's testimony about his 2004 interview of Walker does not undermine her credibility. He played for Walker a segment of her taped interview with private investigator Jenny Moreland and asked Iacullo if she could make out what she had said in identifying certain people with whom she had dealt drugs. Given the tape's poor quality, her inability to make this out is not surprising. Nor, in the Court's view, does it support the proposition that Iacullo had made up the names or that Moreland fed them to her.

talked about Iacullo's statements regarding drug dealing – at a restaurant called Pal Joey's – but had no notes of that meeting.  Lullo's explanation that he took no notes because Walker provided no new information was not believable.  More generally, each of these witnesses would have had a motive to omit from reports claims by a witness that tended to incriminate a prosecutor from the office conducting the homicide investigation.

The Court also rejects respondent's contention that Walker was induced or influenced to make up her claims regarding Iacullo's statements about prosecutors' drug use during interviews in 2002-03 with Marion Brooks, a reporter for a local NBC-affiliated television station, and Jenny Moreland, an investigator working for Caffey's post-conviction attorney.  Brooks contacted Walker while investigating the Evans murders, several years after Caffey and his co-defendants were convicted.  Brooks told Walker that her name had shown up in some police reports.  Brooks conducted a videotaped interview of Walker at her home, with Moreland present.  Moreland conducted her own interviews, which were audio-recorded.  Walker was aware that Moreland worked for Caffey's post-conviction attorney.

Respondent contends that one or both of these interviewers deliberately planted with Walker the idea of prosecutors' drug use, as well as the names of Kendall and others, and that Walker picked up the ball and ran with it.  The Court finds no viable support for these propositions.  The transcript of Walker's interview by Brooks reflects that early in the interview, without prompting, Walker told Brooks that Iacullo had said she "better not get hung up in all this – she better not get in any kind of trouble for it . . . because she was dealing and supplying drugs to her attorney and in turn he was

53

supplying and she was supplying members of the DuPage County State's Attorney's Office."  Resp't Hrg. Ex. 4 at 4.  Walker also stated that Iacullo "was putting out names at the DuPage County Prosecutor's Office, who she knew, and that if she goes down then everyone is going."  *Id.* at 4-5.  Walker told Brooks that she had reported Iacullo's statements and specifically remembered speaking with detective Lullo about this.  *Id.* at 6 & 8.  Near the end of the interview, after Walker had said she could not recall the names Iacullo had given due to the passage of time, Brooks listed the names of several people – "Michael Wolf, Echol [sic], Jeff Kendall, John Kasella [sic]" – and asked if any of them sounded "familiar."  *Id.* at 13.  Walker said she could not be sure of the names because she would have heard them when she worked for the county, but stated that "Kendall and Kasella sounds [sic] familiar."  *Id.*  This does not indicate, as respondent contends, that she was feeding names to Walker or attempting to push her in a particular direction.  Rather, it is plain from the context of the interview Brooks offered names to attempt to refresh Walker's memory about events that had occurred seven years earlier.  In any event, long before that part of the interview, Walker had already reported to Brooks, without leading or prompting, Iacullo's statement about supplying drugs to DuPage County prosecutors.

During her subsequent interview by Moreland, Walker stated, consistently with her earlier and later statements, that Iacullo said she was involved in something that was someone else's idea and that if she was going to go to jail for it, she would expose that she was selling drugs to prosecutors and attorneys with DuPage County.  Walker said that Iacullo named "Drake [sic], Kendall, and [Gogh] [sic]."  Resp't Hrg. Ex. 5 at 5

(brackets in original).  Again, there is no evidence that Moreland prompted or pushed her to say this.[7]

In sum, the evidence shows that when speaking to Walker shortly after the Addison murders, Iacullo did in fact say that she had knowledge of drug use by DuPage County prosecutors and that if charged, she would reveal this.  Second, the evidence also shows that in those same comments to Walker, Iacullo gave the names of prosecutors; the Court finds no viable support for the proposition that Walker made that up.

The third question – what names Iacullo gave – is somewhat closer.  Respondent contends that in her statements to Brooks, Moreland, and thereafter to the effect that Iacullo had named Kendall, Walker picked up on names mentioned by an interviewer, adopting a name that "sound[ed] familiar" rather than communicating an actual memory of anything Iacullo had said.  The Court acknowledges that this is a colorable argument.  Moreland, an investigator for Caffey's lawyer, and Brooks, a reporter trying to make a

---

[7]     Respondent sought to admit, pursuant to Fed. R. Evid. 806, a stipulation and accompanying exhibits establishing Moreland's conviction for wire fraud in June 2012, in connection with a loan she obtained from another individual.  Rule 806 allows impeachment of a declarant whose hearsay statements have been admitted in evidence.  Respondent cites the Court's admission of respondent's own exhibits, transcripts of interviews that Moreland conducted with Walker and Dwight Pruitt.  Moreland's statements during those interviews, however, were not hearsay; they were questions and thus were not offered to show the truth of what Moreland said.  Instead, Moreland's statements were admitted to provide the context for Walker's statements, *as respondent's counsel specifically requested at the hearing*.  See July 20, 2013 Tr. 250 ("This is not for the truth of the matter asserted, Judge, but for the context."); *see also, e.g., Lee v. McCaughtry*, 892 F.2d 1318, 1324 (7th Cir. 1990).  Because Moreland is not a declarant whose hearsay statements were admitted in evidence, the impeachment is not admissible under Rule 806.
        Respondent also argues that Moreland's conviction supports the proposition that she importuned or urged Walker to name Kendall as a purchaser of illegal drugs.  The conviction is inadmissible for this purpose.  *See* Fed. R. Evid. 404(b) (evidence of another crime is not admissible to prove a person's character to show that she in accordance with the character).  And even were the Court to admit Moreland's conviction, it would not lead the Court to find that importuned Walker or Pruitt to make up a story or to make up names.  The conviction does not suggest a general propensity to get others to make things up.

story, arguably had a motive to get Walker to name particular names. That does not mean, however, and the Court does not intend to suggest, that Brooks, Moreland, or any other interviewer deliberately pushed Walker to identify Kendall or any other particular prosecutor. As the Court has indicated, the context of Brooks's interview reflects that she was simply trying to refresh Walker's recollection about the specifics of statements by Iacullo that Walker had already disclosed entirely without prompting or suggestion.

Part of the reason that respondent's argument has some color is the failure of law enforcement investigators to memorialize Walker's earlier statements. In her statements that have been memorialized, including testimony when she was subject to adverse examination, Walker has consistently stated that Iacullo identified Kendall and at least one other prosecutor. The Court notes that Walker has also consistently stated that Iacullo identified "Drenk" or "Drake" as one of the drug users she would expose – and Drenk, Iacullo's lawyer, unequivocally confirmed to police that he had, in fact, used drugs with Iacullo. That tends to show that when Walker said Iacullo named particular names, she was speaking from actual (though refreshed) memory, not from suggestion. On balance, considering all of the evidence, the Court is persuaded of the credibility of Walker's statements that Iacullo identified Kendall when she said she had knowledge of drug dealing involving DuPage County prosecutors. That said, the Court cannot definitively rule out the possibility that in telling Brooks, Moreland, and later interviewers and questioners that Iacullo named Kendall or "Consuelo," Walker was adopting a name that simply "sound[ed] familiar" rather than communicating an actual memory of what Iacullo had said.

Finally, the Court rejects respondent's contention that Walker's credibility is undermined because she had a grudge against the DuPage County Sheriff's Office. It is apparently true that Walker was terminated by that office – in 1993 or 1994 – but it is undisputed that she settled the dispute on terms she presumably found acceptable. And, based on the evidence, the Court does not accept the proposition that a grudge against the Sheriff's Office would have led Walker to claim, falsely, that Iacullo had implicated particular prosecutors (not Sheriff's Office personnel).

To summarize: The Court finds that Caffey has shown by a preponderance of the evidence that Cara Walker told law enforcement, prior to Caffey's trial, that Vikki Iacullo claimed knowledge of and possibly involvement in the Addison murders and said that if charged, she would reveal her knowledge of drug use by DuPage County prosecutors, including Jeff Kendall.

### b.      Pruitt's claims about drug use by Kendall

The Court turns next to the evidence regarding Dwight Pruitt. Pruitt has likewise offered evidence relating to narcotics involvement by then-prosecutor Kendall. Caffey offers this evidence as tending to confirm the truthfulness of Walker's account of what Iacullo told her about Kendall.

The basics of Pruitt's story regarding Kendall have been consistent, going back to as early as 2001. Since at least that time, Pruitt, who was dealing drugs during the relevant period, has consistently stated that on two occasions in or about 1995, he drove a man working for him to locations in the Wheaton area to sell cocaine to another man, who Pruitt later said was Kendall. Pruitt says the man he drove was nicknamed "Black," and Pruitt now appears to have identified him as Jamah Taylor. Pruitt says that

on the two occasions in question, he took Black to particular locations to sell user

quantities of cocaine to another person.  Pruitt did not witness any hand-to-hand

transfer and, in particular, did not see Kendall acquire the drugs.  He did, however, see

the same white man on both occasions in the vicinity of Black after he got out of the car,

and shortly thereafter, Black returned to the car with money and without the drugs.[8]

Pruitt made the connection to Kendall in or about 1998 after Taylor, who was later

detained at the DuPage jail at the same time as Pruitt, told Pruitt he had sold drugs to

Kendall on these occasions.[9]

Pruitt's basic story held up under what one can fairly characterize as a withering

cross-examination by former DuPage County State's Attorney (now appellate court

justice) Joseph Birkett during Pruitt's May 2004 deposition in Caffey's post-conviction

case.  Birkett's questioning of Pruitt at the deposition was done in a manner and style

that was quite clearly designed to shake Pruitt from his story.[10]  But Pruitt was not

tripped up, and he maintained his story.  And it is, without significant variation, the same

---

[8] During his testimony at the evidentiary hearing, Pruitt said that he did not actually see the white man in either of the *meetings* with "Black," but that is not inconsistent with his deposition testimony about seeing them in the same location immediately before the drug transfers.

[9] Respondent has offered evidence that Taylor later denied selling drugs to Kendall but did not present any testimony or other material to the Court from which the Court could assess Taylor's credibility.  Given the paucity of evidence on this point, the Court has little choice but to discount Taylor's apparent denial.

[10] The Court does not intend anything pejorative by this. Birkett's conduct of the deposition was entirely appropriate given the fact that Caffey was attempting, via the post-conviction petition, to undo his conviction, which Birkett's office had obtained.  One of the cross-examination tactics that Birkett used during the deposition was to repeatedly skip back and forth among topics, without transition, repeatedly returning to the same points over and over.  It is rather apparent from the context that this tactic was designed to make Pruitt respond spontaneously without extended time to reflect, which one might argue would lead to more candid responses.  As the Court has indicated, however, Pruitt told a consistent story throughout the deposition.

story he offered, credibly in the Court's view, in his testimony at the evidentiary hearing on the present habeas corpus petition.

The only significant inconsistency in Pruitt's account came in a 2004 interview by Sergio Serritella, an investigator for Caffey's post-conviction attorney. In that interview, Pruitt said that his denial, during the post-conviction deposition, that he had actually seen the transfer of drugs to Kendall was untrue. Still later, Pruitt recanted this statement and explained it by saying that he would get $100 in transportation and expense money from the investigator and wanted to keep that money coming. The Court does not regard the statement to Serritella as credible given its variance from the account that Pruitt has otherwise given in a consistent fashion. In other words, the Court does not believe that Pruitt observed the actual transfer of drugs from "Black" to his customer.

Respondent cites a video-recorded interview of Pruitt by Terry Ekl, an attorney representing Kendall, as undermining the credibility of Pruitt's account and as tending to show that he was induced by reporter Brooks and/or investigator Moreland to make up that account. Neither proposition is persuasive. First of all, the Court is constrained to note the curious circumstances of Ekl's interview of Pruitt. At the time, Pruitt was incarcerated in the Cook County Jail on a narcotics charge. Ekl, a private attorney, somehow managed to interview Pruitt, who was not his client, inside a county jail along with a video cameraman, without any prior notice or warning to Pruitt. Ekl claims that he was able to arrange this by doing nothing more than sending a letter to the jail's executive director seeking permission, permission that he obtained by fax the following day. There are some propositions that are absurd on their face, and this is one of them.

To be sure, the letter that Ekl cites exists, but his denial, during the hearing before the Court, that anyone made a call or paved the way on his behalf was not credible. It is overwhelmingly likely that Ekl was, to use a locally familiar term, "clouted" in, in order to facilitate his representation of Kendall, a prosecutor from a neighboring county.

In addition, when one views the video recording of the interview, it is clear that some discussion between Ekl and Pruitt occurred before the interview began. By itself, that is neither unusual nor suspicious. Indeed, Ekl himself testified that before the camera was turned on, he told Pruitt that he represented an assistant state's attorney and discussed the then-pending charges against Pruitt. But Pruitt also says that Ekl committed to get a lawyer who would assist Pruitt on his pending case. That testimony was credible. Indeed, what ultimately happened is that when Pruitt went to court on the charge, an attorney named Michael Goggin appeared from out of the blue and was able to secure dismissal of the charge. (There was nothing inappropriate about Goggin's actions in representing Pruitt or in the dismissal of the case.) Both Ekl and Goggin claimed that payment was expected, but Pruitt testified otherwise, and his testimony was credible – Goggin, contrary to common criminal defense practice (particularly for a client one has never met), asked for no money up front and had no expectation of recourse to bond money, as Pruitt had not made bond.

In sum, the evidence reflects that Ekl obtained Pruitt's cooperation by promising to get a lawyer to handle his case, and Goggin stepped in, likely as a favor to Ekl.

All of that said, it does not appear that Ekl's promise of assistance to Pruitt had any significant impact on his statements in the interview. Although Ekl had already secured Pruitt's cooperation by his promise of legal assistance, and although he

conducted the interview in a highly leading fashion, he obtained nothing during the interview that materially contradicted Pruitt's otherwise largely consistent account of the events in question.  Ekl elicited an acknowledgment by Pruitt that he had no *direct* knowledge of drug usage by DuPage County prosecutors, including Kendall and others, but as the Court has noted that is consistent with what Pruitt has said on other occasions.  The interview includes a cryptic reference to Pruitt having heard, while in the DuPage jail, a "rumor" about a prosecutor that he reported to Mike Wolfe, but Ekl did not elicit what the rumor was, so this statement has no real utility.

Pruitt also stated in the interview by Ekl that he had "played" reporter Brooks and investigator Moreland when he spoke with them in 2001-2002.  He said that they had bought him meals and clothing (to wear for a video interview), Brooks gave him $95 on one occasion, and she also purchased a ticket for him to fly to Seattle – which Pruitt has testified credibly that he never used.  But Ekl did not tie up in the interview exactly what, if anything, Pruitt had supposedly told Brooks or Moreland that was incorrect.

Nor does the text of Moreland's audio-recorded interview suggest that he was making something up or biting on a name proposed by the interviewer.  Rather, the interview tends to show that Pruitt claimed actual knowledge, part of it second-hand (as he later confirmed), of drug sales to a DuPage County prosecutor.  Moreland identified possible names and indicated that she believed that Kendall was a likely candidate.  Pruitt confirmed, though not expressly, that Kendall was the person whose involvement he was aware of.  But he did not bite on other suggestions that Moreland made, and the interview as a whole indicates that he was speaking from actual memory, not making something up based on prompting or a suggestion.

61

The totality of the evidence about Pruitt, including his testimony before the Court suggests that he has some willingness to embellish his accounts of events one way or the other, to fit the perceived desires of the particular interviewer, if he (Pruitt) has the hope of getting something valuable in return. This is just as true with regard to the Ekl interview as it is with regard to the Brooks and Moreland interviews. For these reasons, the Court places greater reliance on Pruitt's May 2004 deposition testimony discussed earlier and his largely consistent testimony before the Court. In neither situation was there any apparent motive for Pruitt to please the questioner. And the Court is unpersuaded that a few meals, an unused plane ticket, and $95 would have been enough for Pruitt to hold up under Birkett's cross-examination during his deposition or to maintain a largely consistent account, even to this day.[11] Thus although Pruitt's story about the drug deals is somewhat short on details and his identification of Kendall is based on second-hand information, the Court finds it largely credible. It provides a modicum of inferential support for Iacullo's claim about having knowledge of drug use by prosecutor Kendall.

### c. Kendall's testimony and his assertion of the privilege against self-incrimination

Finally, the Court addresses former ASA Kendall's testimony at the evidentiary hearing. Respondent called Kendall to testify. On direct examination, Kendall testified that with regard to Iacullo and Pruitt, he never purchased drugs from them, sold drugs to them, used drugs with them, or discussed drugs with them. He also said that he sat in on an interview with Jamah Taylor in 1997 about an unrelated crime. He said that he

---

[11] It is somewhat ironic that respondent contends, on the one hand, that Pruitt was influenced by a small amount of money and some meals provided by Brooks, but on the other hand, that he was not influenced by Ekl's promise to provide him with a lawyer on his then-pending narcotics charge.

had not met Taylor prior to the interview. Kendall testified that he never purchased cocaine from Taylor, sold cocaine to him, used cocaine with him, or discussed cocaine with him.

On cross examination, Caffey's attorney asked Kendall whether, between December 1994 and January 1999, he ever "possess[ed], purchas[ed], or use[d] controlled substances such as cocaine." July 19, 2012 Tr. 153. In response, Kendall claimed his privilege against self-incrimination. *Id.* 154. He likewise claimed the privilege when asked what controlled substances he purchased, who he purchased controlled substances from, where he purchased such substances, and what he gave in exchange. *Id.*155-56. When asked whether he had knowledge of any other DuPage County prosecutors possessing, using, or purchasing controlled substances from 1994 and 1999, Kendall answered, saying no. Finally, when asked whether he had attended any drug or alcohol rehabilitation program, Kendall again claimed his privilege against self-incrimination.

The Court heard argument, including from an attorney representing Kendall, regarding the viability of the privilege claim. The Court found the contention that there was a reasonable fear of prosecution to be rather strained but has nevertheless concluded, out of an abundance of caution, that the privilege claim was not inappropriate. That, however, does not prevent the Court from drawing an inference adverse to Kendall from the privilege claim. *See Baxter v. Palmagiano*, 425 U.S. 308, 318 (1976); *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995). Kendall was responding to probative evidence, from Iacullo (via Walker) and Pruitt, regarding narcotics use. Taken in context, his claim of privilege was a virtual

63

admission. His reliance on the privilege was highly selective; Kendall willingly

responded in a self-exculpatory way to targeted and focused questions from a friendly

questioner, but he declined to respond to more general questions from an adversary.

Considering all of the other evidence, the Court concludes it is appropriate to draw an

inference adverse to Kendall, specifically that he used illegal controlled substances

during the relevant period.

Respondent relies on cases that discuss whether a witness's invocation of the

privilege may result in an adverse interest against a party to litigation. It is far from clear

that this paradigm even applies here, given the context. The Court is drawing an

inference that is "adverse" to respondent only in the rather attenuated sense that the

inference is pertinent to the question of whether there was *Brady* material that the

prosecution in the underlying litigation ought to have disclosed to Caffey. Though

respondent essentially represents the interests of a party to the underlying litigation –

the prosecution – the inference is not drawn either against respondent or the

prosecution, but rather against Kendall.

But even if the cases upon which respondent relies apply, the requirements for

an adverse inference are met. There is undeniably a "relationship of loyalty" between

Kendall and respondent; respondent is representing the interests of the prosecution, a

team of which Kendall was a significant member. *See, e.g., LiButti v. United States*,

107 F.3d 110, 122 (2d Cir. 1997). And although respondent has no apparent control

over Kendall at this point, they share a mutual interest in the present litigation, and

Kendall's role as a key prosecutor in the underlying litigation that is under review makes

the inference appropriate despite the absence of control. *Id.* at 123-24. Finally, as

discussed earlier, an inference adverse to Kendall is trustworthy under the circumstances. *Id.* at 124. The upshot of the inference the Court has drawn is it lends some credence to Iacullo's claim of knowledge of drug use by Kendall.

### d. Issue of drug use by prosecutors other than Kendall

The Court notes, by contrast, that there is no evidence to support the proposition that then-prosecutor John Kinsella (whose last name arguably corresponds to the term "Consuelo" that Walker used) had anything to do with drug use, drug purchases, or drug sales. The fact that Iacullo said or suggested as much does not make it so.

### e. Summary of findings

To summarize: Caffey has proven by a preponderance of the evidence that prior to his trial, Cara Walker told law enforcement officers involved with the murder investigation that Vikki Iacullo claimed to have knowledge regarding the murders and said that if arrested or charged, she would reveal that she had knowledge of illegal drug use by DuPage prosecutors, including Kendall, one of the prosecutors in Caffey's case. It is undisputed that this information was not disclosed to Caffey prior to or during his criminal trial.

### f. Merits of Caffey's *Brady* claim regarding Iacullo

As noted earlier, Caffey contends that the evidence of Iacullo's statements to Walker about involvement with the perpetrators was material and should have been disclosed because it would have supported his argument that Iacullo's later out-of-court statements to law enforcement were sufficiently reliable to be admitted. Caffey also contends that the evidence shows that the prosecution and Iacullo had at least a tacit understanding that if she kept quiet about her knowledge of drug use by DuPage

County prosecutors, she would not be charged with murder. Knowledge of the existence of this agreement to keep Iacullo off the witness stand, Caffey contends, would have strengthened his argument for admitting into evidence Iacullo's out-of-court statements to law enforcement.

Caffey's first point lacks merit. Any undisclosed statements about knowledge or involvement in the murders that Walker attributes to Iacullo would have added nothing of significance to a claim of reliability of her out-of-court statements. Based on the record before the Court, Iacullo did not provide Walker with much information, or any details, about her involvement in or knowledge of the murders. The limited information that Iacullo gave Walker would have added nothing of significance to the other information that Caffey already had that reflected Iacullo's involvement. Caffey has offered no viable basis to believe that including in the mix Iacullo's statements to Walker could have or would have carried him over the top in getting Iacullo's statements to law enforcement into evidence.

Caffey's second argument is that the prosecution manipulated matters to keep Iacullo from testifying at his trial. Iacullo declined to testify, claiming her privilege against self-incrimination. Caffey contends that her absence was, in effect, procured by the prosecution in that it tacitly agreed that if she kept quiet, she would not be charged.

If proven, this might amount to a viable claim. "It is well-settled that substantial government interference with a defense witness's free and unhampered choice to testify violates the defendant's due process rights." *Newell v. Hanks*, 283 F.3d 827, 837 (7th Cir. 2002) (citing, among other cases, *Webb v. Texas*, 409 U.S. 95 (1972)). *Cf. Arizona v. Youngblood*, 488 U.S. 51 (1988) (bad faith failure of law enforcement to preserve

potentially useful evidence may violate due process); *Valenzuela-Bernal*, 458 U.S.at

873 (suggesting that government's deportation of witness, if done in bad faith, that

deprives defendant of favorable and material evidence would violate due process);

*Washington v. Texas*, 388 U.S. 14, 16 (1967) (arbitrary deprivation of testimony relevant

and material to defense violates Sixth Amendment); –*United States v. Chaparro-*

*Alcantara*, 226 F.3d 616, 623 (7th Cir. 2000).

Caffey has failed to prove, however, that the prosecution had any sort of tacit

understanding with Iacullo or her lawyer or that it did anything manipulative in dealing

with the possibility of charges against her. First of all, Iacullo *was charged* criminally in

connection with the homicide investigation, with obstruction of justice and unlawful

possession of a weapon. Based on these charges alone, she had a legitimate basis to

decline to testify in Caffey's case. Second, as then-prosecutor Kinsella credibly

testified, there was a considerable amount of evidence connecting Iacullo to the Evans

murders, or at least to the perpetrators and the events surrounding the murders. Iacullo

provided to Williams the gun that was used to shoot Debra Evans, she disposed of the

gun after the shooting, and she prepared a phony birth certificate for the baby who had

been forcibly removed from Evans's uterus. Given these facts, no competent defense

attorney would have advised Iacullo to do anything other than invoke her privilege

against self-incrimination, as her attorney Brad Telander credibly testified.

Furthermore, the Court finds evidence of a tacit understanding to be lacking.

There is no evidence that the possibility of Iacullo testifying in Caffey's trial was ever

brought up. This is unsurprising, given the evidence implicating her and the pending

charges against her. No one, neither prosecutor nor defense attorney, reasonably

could have believed there was any possibility that Iacullo would get onto a witness stand until the pending matters involving her were resolved. (Indeed, even at the evidentiary hearing before this Court, held in 2012, Iacullo claimed the privilege when asked about the murders.) Nor is there any indication of any sort of deliberate delay of disposition of Iacullo's pending charges in order to string things out past Caffey's trial. Though the charges were pending for an unusually long period – three years – Telander credibly testified that this happened because, in the interim, Iacullo was arrested separately charged with a narcotics offense. Resolution of the obstruction and weapons charges was deferred for an extended period while Telander and the prosecution litigated a motion to quash arrest on the narcotics charge.

Former prosecutor Wolfe's testimony regarding the absence of a deal with Iacullo was likewise credible. Wolfe testified that he made no deal and had no negotiations with Iacullo or Telander, and, in referring to the transcript from Iacullo's sentencing hearing, pointed out that he argued for a sentence of incarceration.

Caffey appears to contend that the prosecution's eventual decision not to charge Iacullo on the murders suggests that the evidence against her was never all that strong and that the claim that she was facing charges was a sham. The evidence does not support this. Kinsella credibly testified that although prosecutors hoped that further evidence of Iacullo's involvement would emerge from the various murder trials, this did not occur. He also credibly testified that serious consideration was given to charging Iacullo in connection with the murders, but that prosecutors ultimately determined that they could not place Iacullo at the murder scenes and thus could not make a case against her beyond the charges she already faced.

In sum, Caffey has failed to establish that there was any sort of a tacit understanding on the part of DuPage County prosecutors not to charge Iacullo in return for her silence.  Nor has he established that prosecutors engaged in any other sort of manipulative or bad faith conduct aimed at keeping Iacullo from testifying.  Rather, Iacullo declined to testify because she and her counsel legitimately believed that she was at risk of prosecution for murder and that her testimony could incriminate her.

As detailed earlier, Caffey's *Brady* claim regarding Iacullo is that disclosure of Walker's statements about what Iacullo had said would have enabled or assisted him in getting her statements to law enforcement admitted into evidence at his trial.  Caffey has failed to establish that this is so.  As a result, his *Brady* claim fails.

### 2.     Claim V-A:  benefits received by Dwight Pruitt

Caffey alleges that prosecutors violated *Brady* by failing to disclose evidence of two types of benefits that Pruitt allegedly received:  favorable treatment at the DuPage County Jail; and non-prosecution for his participation in drug transactions with prosecutor Kendall.  The state appellate court rejected these claims on their merits. *Caffey II*, slip op. at 44-52.

Some of the evidence that the Court received and discussed in connection with the Iacullo-related *Brady* claim also might be claimed to support the Pruitt-related *Brady* claim.  But because the state court addressed the latter claim on its merits, the Court did not order an evidentiary hearing on the claim.  The Court has not considered the additional evidence in connection with the present claim, though it notes that this evidence would not make a difference in the claim's resolution.

Nor does the Court consider this *Brady* claim *de novo*. Because the state appellate court addressed the claim on its merits, this Court considers only whether the state court unreasonably applied federal constitutional law in rejecting the claim. *See* 28 U.S.C. § 2254(d)

Regarding the matter of favorable treatment in jail, Pruitt testified that he received restaurant meals on certain occasions, showers "off the deck," and a contact visit with Patrice Scott and his daughter, and that he was not charged for getting into a fight with a guard. Pruitt also testified that prosecutor Wolfe told him he was getting "VIP treatment." Pruitt Dep. at 11. Caffey argues that had he been aware of these benefits, he could have established Pruitt's bias in favor of the prosecution and a motive to lie or embellish his testimony in the prosecution's favor. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) (evidence used to impeach a government witness by showing bias is considered favorable evidence under *Brady*).

The Illinois Appellate Court carefully assessed the evidence concerning the benefits that Pruitt received. The court noted that Pruitt admitted that he received "restaurant meals" only on days when he was at the courthouse to testify or to prepare to testify; he showered off-deck only three or four times; and his single contact visit with Scott and his daughter occurred at the courthouse with a prosecutor present. *Caffey II*, slip op. at 45. The court also noted that although Pruitt was not formally disciplined in connection with his fight with a guard, he was placed in segregation after the incident. *Id.* The court further explained that ASA Wolfe's statement to Pruitt about receiving "VIP treatment" was not accompanied by any further conversation indicating that the prosecution expected favorable testimony from Pruitt in return for such treatment. *Id.* at

45-46.  The court also found  relevant Pruitt's deposition testimony that he "didn't have

no conversation about the privilege[s], I just accept them."  *Id.* at 46; *see* Pruitt May 21,

2004 Dep. at 10.

The appellate court determined that the benefits that Pruitt had received were

immaterial.  Applying the principles of *Brady*, the court stated that it did not believe that

the undisclosed evidence "would have convinced a jury that Pruitt had strong and

substantial reasons to testify in the manner that the government desired" and found it

"unlikely that a jury would have believed that [Pruitt] had agreed to testify falsely in

return for the minimal benefits alleged to have been provided here."  *Caffey II*, slip op. at

47-48 (internal quotation marks omitted).  The court concluded that the prosecution's

failure to disclose this evidence "does not cause us to view the case in a different light."

*Id.* at 48.  In this regard, the appellate court considered it significant that Pruitt's trial

testimony was consistent with the testimony he had given at a pretrial hearing on the

admissibility of Joshua Evans's statements, a hearing that was held *before* Pruitt

received any of the benefits in question.  The appellate court also looked to the

supreme court's decision on direct appeal, noting that the supreme court had made no

reference to Pruitt's testimony in detailing the evidence of Caffey's guilt.  Given these

factors, the court concluded that Caffey's inability to cross-examine Pruitt about the

benefits he received at the jail did not "undermine [ ] confidence in the verdict."  *Id.*; *see*

*Kyles*, 514 U.S. at 435 (stating that to prove a *Brady* violation, a petitioner must

demonstrate that the favorable evidence could reasonably be taken "to put the whole

case in such a different light as to undermine confidence in the verdict").

The state court did not unreasonably apply federal constitutional law in rejecting this claim. As discussed above, the court properly identified *Brady* as the governing law and thoroughly examined the nature of the benefits at issue. The appellate court's conclusion that the benefits were relatively minor in the scheme of things was not unreasonable. To put things in perspective, there was no indication of any consideration for Pruitt connected with his then-pending criminal charges – *that* might have been a significant benefit. And the appellate court reasonably found it significant that Pruitt's pretrial testimony, which predated his receipt of the benefits in question, was consistent with his testimony at trial. In addition, Caffey's counsel impeached Pruitt's credibility at trial on three other bases: his prior convictions, his delay in calling the police, and the fact that he had not told police on November 17 that Joshua had named the perpetrators. For these reasons, the state appellate court's rejection of Caffey's *Brady* claim regarding the undisclosed benefits was not an unreasonable application of federal constitutional law.

Caffey also argues that the prosecution's failure to disclose Pruitt's non-prosecution for participating in drug transactions with Kendall deprived Caffey of the opportunity to impeach Pruitt's credibility on that basis. Specifically, Caffey asserts that had the prosecution disclosed this information, he could have established that Pruitt was testifying favorably to the prosecution to avoid being prosecuted himself.

The appellate court assumed the truth of these allegations but found the evidence immaterial. The court noted that Pruitt testified that he was not promised or given anything in exchange for his trial testimony. The court again found significant the consistency between Pruitt's trial testimony and his pretrial testimony, which he gave

about one year *before* he claimed to have learned of Kendall's involvement in the drug transaction. *Caffey II*, slip op. at 48.

These determinations do not represent an unreasonable application of federal constitutional law. The court properly focused its inquiry on the issue of whether the undisclosed evidence, if offered, could have influenced the jury's consideration of the case. The state court's reliance on the fact that Pruitt's pretrial hearing testimony, which predated his claimed realization about Kendall, was consistent with his trial testimony was eminently reasonable.

For these reasons, the Court overrules Caffey's *Brady* claim regarding Dwight Pruitt.

## Conclusion

The Clerk is directed to substitute Rick Harrington as the respondent in this case. For the foregoing reasons, the Court denies Caffey's petition for writ of habeas corpus [docket no. 7] and directs the Clerk to enter judgment in favor of the respondent. The Court grants a certificate of appealability as to each of Caffey's claims adjudicated in this decision, because the ruling on each is fairly debatable.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 7, 2013